SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Frances Green v. Monmouth University (A-63-17) (080612)**

**Argued January 3, 2019 -- Decided May 7, 2019**

**FERNANDEZ-VINA, J., writing for the Court.**

Plaintiff Frances Green brought suit against Monmouth University for injuries she allegedly sustained while attending a Martina McBride concert that was held in a University facility but was open to the public. In this appeal, the Court considers whether the University is immune from Green's suit pursuant to the Charitable Immunity Act, N.J.S.A. 2A:53A-7 to -11. Under the circumstances of this case, the answer to that question hinges on whether, in hosting the concert, the University was engaged in performing the educational objectives it was organized to promote and whether Green was a direct recipient of its works when she attended the concert.

Defendant Monmouth University is a non-profit educational institution. In its certificate of incorporation, the University states that its "purposes" include providing "for the holding of meetings and events open to the public, including classes, conferences, lectures, forums, exhibitions, conventions, plays, motion pictures, concerts, and athletic contests, all calculated, directly or indirectly, to advance the cause of education and wholesome recreation."

Monmouth University and Thoroughbred Management, Inc. (TMI), a for-profit corporation, entered into an agreement that allowed TMI to use the University's Multipurpose Activity Center (MAC) for the McBride concert. TMI paid a $10,000 rental fee. According to the Vice President of Student Life at Monmouth University, the intent of that fee was "to cover the cost of the set up of the facility, the breakdown, the police costs, [and] fire safety," among other components. In addition, guests were charged a "facility fee" of $3.00 per ticket, the proceeds of which were split evenly between the University and TMI. The Vice President also testified that the University did not expect to make money on its fee but instead hoped to cover its direct costs.

While attending the concert, Green was climbing a set of stairs in an area that she alleges was poorly lit. As Green stepped onto what appeared to be a solid surface, her foot slipped down to the step below, causing her to fall forward. Her face struck the back of a seat in one of the rows adjacent to the stairs. A University police officer walked to where Green fell and observed a rubber strip sticking out from the step.

1

Green filed a complaint against the University. Both parties moved for summary judgment. The trial court granted summary judgment in favor of the University. Noting that the University's resolution states that the University's purposes include holding concerts for the general public to advance the cause of education and wholesome recreation, the court determined that the McBride concert fell "squarely within those purposes." And the court found that, even though Green was not a University student, she was a beneficiary of its educational purpose when she attended the concert. The trial court thus concluded that charitable immunity applied against Green's claim.

Green filed a timely appeal, and, in a split decision, the Appellate Division affirmed the trial court's determination. 452 N.J. Super. 542, 561 (App. Div. 2018). The dissenting judge determined immunity to be inappropriate in light of the income the University derived from the concert and the disputed question of whether McBride's concert was an "artistic performance" that served the University's educational goals. Green appealed to the Court as of right based on the dissent. See R. 2:2-1(a)(2).

**HELD:** The concert was promoting the University's educational objectives and purposes at the time of Green's injury, and as a result, Monmouth University is afforded charitable immunity. Although Green was not a Monmouth University student, she was a beneficiary under the language of the Charitable Immunity Act.

1. The Legislature prescribed that the Charitable Immunity Act "shall be deemed to be remedial and shall be liberally construed so as to afford immunity to" nonprofit entities "organized for religious, charitable, educational or hospital purposes." N.J.S.A. 2A:53A-10. The Act sets out the contours of the immunity it grants to nonprofit entities in N.J.S.A. 2A:53A-7(a). "Distilling the statutory language to its essence," the Court has determined that "an entity qualifies for charitable immunity when it (1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works." Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 342 (2003). There is no dispute here that the University satisfies the first two prongs of that standard. The third prong of the charitable immunity test involves two inquiries: (1) whether the organization pleading the immunity, at the time in question, was engaged in the performance of the objectives it was organized to advance; and (2) whether the injured party was a direct recipient of those good works. Id. at 350. (pp. 15-18)

2. Although some nonprofits provide a wide range of services beyond their core purpose, such activities do not eviscerate their entitlement to immunity as long as the services or activities further the charitable objectives the entities were organized to advance. The Court reviews a number of cases and focuses on a case similar to this one, in which the Appellate Division held that Princeton University was "entitled to immunity from a claim arising out of the rental of an auditorium to another non-profit entity that use[d] the

2

facility for . . . educational purposes" -- a concert. Lax v. Princeton Univ., 343 N.J. Super. 568, 573 (App. Div. 2001). In Lax, the Appellate Division stated that the Princeton Chamber Symphony was a nonprofit corporation that rented an auditorium from Princeton University, also a nonprofit corporation, for approximately $5000 per concert. Id. at 569. The plaintiff, who was not a Princeton student, purchased a ticket and attended a Symphony concert, where the plaintiff fell. Id. at 570. The panel found that the plaintiff's subsequent tort claims were barred by charitable immunity as to both the orchestra and the university. Id. at 572. The Lax court's ruling and the other opinions discussed cumulatively reflect the liberal construction the Legislature has prescribed for the Charitable Immunity Act. Courts have found institutions offering an array of services to be educational in nature and have found a broad variety of activities offered by educational institutions to advance their educational objectives. (pp. 18-25)

3. The second portion of the third prong of the charitable immunity test focuses on whether the plaintiff was benefitting from the institution's educational works when he or she was injured. Courts will typically find Ryan's third prong met if the plaintiff's presence was clearly incident to accomplishment of the defendant's charitable purposes. Courts also consider, but are not bound by, the purposes set forth in the organization's certificate of incorporation. Otherwise, every non-profit corporation could unilaterally insulate itself from tort liability merely by setting forth a list of beneficiaries sufficiently broad to include all possible claimants. And charitable immunity can still apply even where the person has paid for the services rendered by the charity. (pp. 25-27)

4. Just as the Appellate Division in Lax found the Chamber Symphony to be "educational" and "charitable" under the Charitable Immunity Act, the McBride concert is afforded similar status. It served the University's stated goals of presenting concerts open to the public to advance the cause of education, and courts should not be in the business of deciding what music constitutes "educational" music and what does not. Furthermore, the Court agrees with the majority that Monmouth University's decision to rent out the MAC to host the Martina McBride concert did not result in the loss of the University's charitable immunity. If hiring third-party professionals triggers the loss of an entity's immunity status, non-profits in turn will be dissuaded from presenting religious, charitable, or educational events, which is contrary to the Legislature's intent. The Court's decision is not at all based on whether the University here made a profit or lost money on the Martina McBride concert. The Legislature could have set up the Charitable Immunity Act to turn on such issues, but it did not. Finally, Green was a beneficiary under the language of the Charitable Immunity Act. (pp. 27-30)

    **AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion. JUSTICE ALBIN did not participate.**

SUPREME COURT OF NEW JERSEY
A-63 September Term 2017
080612

Frances Green,

Plaintiff-Appellant,

v.

Monmouth University,

Defendant-Respondent,

and

Press Communications, LLC,
d/b/a Thunder 106, and
AEG Worldwide,

Defendants.

On appeal from the Superior Court,
Appellate Division, whose opinion is reported at
452 N.J. Super. 542 (App. Div. 2018).

| Argued | Decided |
| --- | --- |
| January 3, 2019 | May 7, 2019 |

Stewart M. Leviss argued the cause for appellant
(Berkowitz, Lichtstein, Kuritsky, Giasullo & Gross,
attorneys; Stewart M. Leviss, on the briefs).

John N. Kaelin, III, argued the cause for respondent
(Schwab, Haddix and Millman, attorneys; John N.
Kaelin, III, on the briefs).

1

Eric G. Kahn argued the cause for amicus curiae New Jersey Association for Justice (Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, attorneys; Eric G. Kahn, of counsel and on the brief).

JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

Plaintiff Frances Green brought suit against Monmouth University for injuries she allegedly sustained while attending a Martina McBride concert that was held in a University facility but was open to the public. In this appeal, we consider whether the University is immune from Green's suit pursuant to the Charitable Immunity Act, N.J.S.A. 2A:53A-7 to -11.

Under the circumstances of this case, the answer to that question hinges on whether, in hosting the concert, the University was engaged in performing the educational objectives it was organized to promote and whether Green was "a direct recipient of those good works" when she attended the concert. See Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 350 (2003).

The trial court answered both of those questions in the affirmative and granted summary judgment in favor of the University. A majority of the Appellate Division panel agreed, relying on the liberal construction of the Charitable Immunity Act and the institutional goals set forth in the University's certificate of incorporation. The dissenting judge determined summary judgment on the basis of immunity to be inappropriate in light of the

2

income the University derived from the concert and the disputed question of whether McBride's concert was an "artistic performance" that served the University's educational goals.

Upon review, we agree with the Appellate Division majority that Monmouth University's decision to host a musical concert open to the public -- an activity explicitly provided for under the "purposes" section of the University's certificate of incorporation -- served its educational goal. We reach that conclusion without regard to the performer, the genre, or the program of the concert. We decline to engage in subjective philosophical questions of whether all music is art or whether all art is educational. We also agree with the majority that, although Green was not a Monmouth University student, she was a beneficiary of its educational purpose under the language of the Charitable Immunity Act when she was injured. Monmouth University is therefore immune from Green's claims, and we affirm the judgment of the Appellate Division.

I.

A.

Defendant Monmouth University is a non-profit educational institution located in West Long Branch. In its certificate of incorporation, the University states that its "purposes" include:

3

> To establish, maintain, and conduct an institution of learning for the purpose of promoting education . . . for the instruction of students in the various branches of technological, professional, vocational, and <u>general cultural education</u> . . . .
>
> <u>To provide for the holding of meetings and events open to the public, including</u> classes, conferences, lectures, forums, exhibitions, conventions, plays, motion pictures, <u>concerts</u>, and athletic contests, <u>all calculated, directly or indirectly, to advance the cause of education and wholesome recreation.</u>

[(emphases added).]

Plaintiff Frances Green is a resident of Long Branch in Monmouth County. On December 9, 2012, Green attended a concert at the University's Multipurpose Activity Center (MAC). The event license agreement described the concert as radio station "Thunder 106's Winter Thunderland: Martina McBride: The Joy of Christmas Tour." Martina McBride is a country music performer, and the concert at Monmouth University was one of sixteen concerts that McBride performed as a part of a tour. The other fifteen concerts were at venues located outside of New Jersey.

By way of background, the University entered into an exclusive booking agreement for the 2010-2012 period with Concerts East, Inc., which agreed to act as the University's "agent for live music entertainment services of artistic performers on behalf of [the University]" for shows at the MAC. Concerts East had the exclusive rights to book concerts for the University and was

4

required to "adhere to the University's established policies and procedures, and be subject to the University's prior written approval."

Under the agreement, Concerts East had rights to proceeds derived from ticket sales, ticket rebates, and sponsorship revenues. In exchange, the University received a $10,000 rental fee for the use of its facility, half of a per-ticket charge called a "facility fee," and commissions on artist merchandise. Furthermore, the University had exclusive rights to proceeds accruing from concessions, its Beer Garden, and parking.

On March 7, 2012, Concerts East assigned its rights and obligations under the booking agreement to Thoroughbred Management, Inc. (TMI), a for-profit New Jersey corporation. Monmouth University and TMI entered into an Event License Agreement on December 5, 2012 that allowed TMI to use the MAC for the McBride concert. The University agreed to handle the over-the-counter advance ticket sales at the MAC box office, but TMI otherwise managed and controlled the ticketing for the event, with tickets sold through Ticketmaster.

Pursuant to the booking agreement, TMI paid a $10,000 rental fee. According to Maryann Nagy, Vice President of Student Life at Monmouth University, the intent of that fee was "to cover the cost of the set up of the facility, the breakdown, the police costs, [and] fire safety," among other

5

components. In addition, guests were charged a "facility fee" of $3.00 per ticket, the proceeds of which were split evenly between the University and TMI. Ms. Nagy testified that the University did not expect to make money on its fee but instead hoped to cover its direct costs.

While attending the McBride concert, Green was climbing a set of stairs in an area that she alleges was poorly lit. As Green stepped onto what appeared to be a solid surface, her foot slipped down to the step below, causing her to fall forward. As she fell, her face struck the back of a seat in one of the rows adjacent to the stairs. Despite the fall, Green stayed to watch the concert. After the concert, she told a University police officer, Corporal Alfonso Acerra, what had happened. Officer Acerra walked to the location where Green fell and observed a rubber strip sticking out approximately two inches from the step. He later acknowledged in a deposition that the strip was a tripping hazard.

B.

Green filed a complaint against the University, alleging that she was a business invitee and the University breached its duty of care to her. Both parties moved for summary judgment. On December 1, 2015, the trial court granted summary judgment in favor of the University.

6

The court found that the University was "without dispute a non-profit educational institution organized for charitable purposes." The trial court thus determined that the dispositive issue in the case was whether the University was promoting its objectives and purposes at the time of Green's injury, and whether Green was a beneficiary of the University's charitable works at the time of her accident.

Noting that the University's resolution states that the University's purposes include holding concerts for the general public to advance directly or indirectly the cause of education and wholesome recreation, the court determined that the McBride concert fell "squarely within those purposes." The court noted that although the concert may have been a commercial activity, it had a direct relationship to the University's stated goals of hosting concerts. The trial court thus distinguished the McBride concert from the YMCA's ski operation found not to fall within the organization's purposes in Kasten v. YMCA, 173 N.J. Super. 1, 10-11 (App. Div. 1980). And the court found that, even though Green was not a University student, she was a beneficiary of its educational purpose when she attended the concert. The trial court thus concluded that charitable immunity applied against Green's claim.

Green filed a timely appeal, and, in a split decision, the Appellate Division affirmed the trial court's determination.  Green v. Monmouth Univ., 452 N.J. Super. 542, 561 (App. Div. 2018).

The majority stressed the Legislature's instruction that, as remedial legislation, the Charitable Immunity Act "'shall be liberally construed so as to afford immunity . . . from liability as provided herein in furtherance of the public policy for the protection of nonprofit corporations' organized for educational purposes."  Id. at 550 (quoting N.J.S.A. 2A:53A-10).  The majority noted that "the term 'educational' has been broadly interpreted and not limited to purely scholastic activities," ibid. (quoting Orzech v. Fairleigh Dickinson Univ., 411 N.J. Super. 198, 205 (App. Div. 2009)), and explained that "[a] non-profit corporation may be organized for 'exclusively educational purposes' even though it provides an educational experience which is 'recreational' in nature," id. at 551 (quoting Roberts v. Timber Birch-Broadmoore Athletic Ass'n, 371 N.J. Super. 189, 194 (App. Div. 2004)).

Turning to the University's certificate of incorporation, the majority noted that the McBride concert served the University's stated goal of presenting concerts for the general public and therefore qualified as promoting the objectives and purposes of the organization.  The majority analogized this case to Lax v. Princeton University, 343 N.J. Super. 568 (App. Div. 2001),

8

finding that although Lax involved a classical music concert, not a country music performance, "music is an art, and McBride is a musical artist. Thus, McBride's concert was a 'cultural and educational experience for patrons of this form of artistic production.'" Green, 452 N.J. Super. at 552 (quoting Lax, 343 N.J. Super. at 572).

The majority also relied on the Lax court's conclusion that the "plaintiff was a direct 'beneficiary' of [Princeton's] educational and charitable endeavor when she was injured while attending one of the Chamber Symphony's concerts. The fact that she was required to pay the admission charge to obtain this benefit does not affect her status as a beneficiary." Ibid. (quoting Lax, 343 N.J. Super. at 572). The panel majority held that Green was likewise a beneficiary of Monmouth University's educational endeavor even though she, like Lax, was a member of the general public who paid an admission charge to attend a concert. Ibid.

The majority then rejected several of Green's arguments, most importantly concluding that the Charitable Immunity Act applied even though the University had rented out its auditorium to for-profit entities. Id. at 553. The majority noted that there was no evidence in the record that the MAC's dominant use was rental to for-profit entities, or that the University sought to profit from the concert. Id. at 555. Although the University received a

9

$10,000 rental fee and $1.50 per ticket for facility fees, the majority found no evidence that such figures were equal to or in excess of the market rate for renting facilities such as the MAC, or that they constituted a profit over the University's cost. Ibid. The majority rejected the dissent's view that the court was compelled to infer, based on the summary judgment standard set forth in Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520 (1995), that the University had a profit motive in hosting the concert, stating that such an inference was not reasonable in light of the record. Green, 452 N.J. Super. at 556.

The dissent found summary judgment inappropriate because, in its view, there was a genuine dispute as to the material issue of whether the concert advanced the University's educational purpose. See id. at 561 (Fisher, J., dissenting). "[A]ssuming the truth of plaintiff's factual assertions and viewing those facts in the light most favorable to her," the dissent reasoned, "requires an assumption that the University's sole interest or involvement in the Martina McBride concert . . . was to offer its premises for a monetary profit." Id. at 561-62. Noting that students had to purchase tickets, that the University did not seek McBride's performance, and that the University had contracted with for-profit entities with no educational purpose in exchange for $10,000 and a "piece of the action," id. at 562, the dissent concluded that an inference could

10

be made that, in hosting the concert, the University was promoting nothing more than the best interests of the University's "bottom line," id. at 564.

The dissent was not persuaded by the majority's reliance on Lax, which the dissent described as "inconsistent with" and an "unwarranted expansion" of the Charitable Immunity Act, id. at 562-63, particularly because "Lax linked the immunity determination to a requirement that the injury occur while the plaintiff attended an 'artistic' performance," id. at 562 n.3. The dissenting judge expressed concern that such a standard is unworkable because it requires courts to determine what constitutes art in each situation because one cannot simply reason, as the majority did here, that "all music is art and all singers are musical artists." Ibid. In the dissent's view, the University was not promoting educational "objectives and purposes" when plaintiff sustained her injuries, and plaintiff was not a "beneficiary" of the University's educational "objectives and purposes." Id. at 563-64.

Green appealed to this Court as of right based on the dissent in the Appellate Division. See R. 2:2-1(a)(2). We granted the motion of the New Jersey Association for Justice (NJAJ) to appear as amicus curiae.

11

II.

A.

Green argues that there were disputed issues of material fact that should have been submitted to the jury, particularly whether the University was motivated by an educational or financial purpose and whether the concert was educational. Green contends that the majority erred in finding that the concert advanced the University's educational purpose on the sole basis of a single line from the University's certificate of incorporation. Green questions the use of what she characterizes as a subjective standard to determine what is "educational" and instead proposes a charitable immunity test based on the University's level of involvement in musical offerings in general and in the concert in particular. Green asserts that if renting its arena for the concert is viewed as part of the University's educational objectives and purposes, then the immunity provided by the Charitable Immunity Act has no boundaries, and the issue of immunity is decided once it is established that the entity itself is "charitable," "religious," or "educational."

B.

NJAJ similarly argues that "the current state of our charitable immunity jurisprudence places our courts in the untenable position of either deciding what is educational or granting a virtually total bar to all liability for

12

educational non-profits." NJAJ contends that by labeling Martina McBride an "artist" whose concert therefore constitutes "a cultural and educational experience, the Appellate Division inadvertently opened the door to an avalanche of litigation" regarding what qualifies as educational. NJAJ asserts that while Martina McBride is at issue today, someone like Eminem, or a monster truck show, could be at issue tomorrow. NJAJ also notes the risk that a college may hold concerts at an arena the size of MetLife Stadium -- with greater ticket sales and profits -- but still seek to claim charitable immunity for those performances. According to NJAJ, without this Court's intervention, courts will be left either to make subjective judgments about whether each event that comes before them is educational, or to allow what was intended to be a "permeable shield" from liability to become a total bar.

NJAJ suggests that this Court adopt "a new test to determine when an educational non-profit promotes its objectives" focused on the question, "what is the school doing?" If that question were asked in this case, NJAJ submits, "the answer would be: the University was renting its facilities for monetary gain," and charitable immunity would not apply. NJAJ suggests that such a test would allow courts to avoid determining what constitutes education and allow organizations to maintain their immunity when and where they are promoting educational objectives.

13

## C.

The University argues that the Appellate Division decided the case correctly. The University contends that it was engaged in the performance of its educational objectives when Green was injured because its certificate of incorporation specifies that an integral part of its educational mission is to hold events and concerts open to the public. The University also asserts that "by attending the concert, [Green] was a beneficiary of [the University's] educational goals." Thus, the University maintains, it is entitled to charitable immunity under N.J.S.A. 2A:53A-7 and relevant case law.

## III.

## A.

A trial court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In considering whether there exists a genuine issue of material fact, the motion judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the

14

alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540.

"Review of an order granting summary judgment is de novo." Davis v. Devereux Found., 209 N.J. 269, 286 (2012). Furthermore, a trial court's determination of the applicability of charitable immunity is reviewed de novo because an organization's right to immunity raises questions of law. Estate of Komninos v. Bancroft Neurohealth, Inc., 417 N.J. Super. 309, 318 (App. Div. 2010).

B.

New Jersey's doctrine of charitable immunity was first declared "as a judicial expression of [New Jersey's] public policy" in D'Amato v. Orange Memorial Hospital, 101 N.J.L. 61 (E. & A. 1925), but was expressly repudiated by this Court in Collopy v. Newark Eye & Ear Infirmary, 27 N.J. 29 (1958), as lacking historical foundation and contrary to "modern concepts of justice." See Collopy, 27 N.J. at 31, 47-48.

The Legislature immediately responded by passing a precursor to the Charitable Immunity Act and, a year later, the Act itself. See Bieker v. Cmty. House of Moorestown, 169 N.J. 167, 174 n.1 (2001). Through that legislation, "'the common law doctrine as it had been judicially defined by the courts of

15

this State' was restored." Id. at 174 (quoting Schultz v. Roman Catholic Archdiocese, 95 N.J. 530, 533 (1984)).

The Charitable Immunity Act's "original purpose was to avoid the diversion of charitable trust funds 'to non-charitable purposes in order to live up to the reasonable expectations of the benefactors.'" Ryan, 175 N.J. at 341 (quoting Parker v. St. Stephen's Urban Dev. Corp., Inc., 243 N.J. Super. 317, 321 (App. Div. 1990)). "Over time, however, our case law has recognized that the purposes underlying charitable immunity are broader than simply preserving charitable trust funds and include the encouragement of altruistic activity" by limiting the economic impact of litigation on charities. Ibid. To effectuate those aims, the Legislature prescribed that the Charitable Immunity Act

> shall be deemed to be remedial and shall be liberally construed so as to afford immunity to the said corporations, societies and associations from liability as provided herein in furtherance of the public policy for the protection of nonprofit corporations, societies and associations organized for religious, charitable, educational or hospital purposes.
>
> [N.J.S.A. 2A:53A-10.]

The Act sets out the contours of the immunity it grants to nonprofit entities as follows:

> No nonprofit corporation, society or association organized exclusively for religious, charitable or

16

educational purposes . . . shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage . . . where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association.

[N.J.S.A. 2A:53A-7(a).]

"Distilling the statutory language to its essence," this Court has determined that "an entity qualifies for charitable immunity when it (1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works." Ryan, 175 N.J. at 342 (quoting O'Connell v. State, 171 N.J. 484, 489 (2002)).

As the Appellate Division stated, there is no dispute here that "the University satisfies the first two prongs of the charitable immunities standard because it is a 'nonprofit corporation . . . organized exclusively for . . . educational purposes.'" Green, 452 N.J. Super. at 550 (quoting N.J.S.A. 2A:53A-7(a)). At issue in this matter is the third prong of the test.

17

C.

This Court has explained that the third prong of the charitable immunity test involves two inquiries. Ryan, 175 N.J. at 350. The first is whether "the organization pleading the immunity, at the time in question, 'was engaged in the performance of the . . . objectives it was organized to advance.'" Ibid. (quoting Anasiewicz v. Sacred Heart Church, 74 N.J. Super. 532, 536 (App. Div. 1962)). The second is whether "the injured party [was] a direct recipient of those good works." Ibid. (citing DeVries v. Habitat for Humanity, 290 N.J. Super. 479, 487-88 (App. Div. 1996)). Here, the question is whether the concert furthered the University's educational objectives and, if so, whether Green was a beneficiary of the concert.

i.

The determination of whether a nonprofit entity's activities are consistent with its stated purpose frequently necessitates a "fact-sensitive inquiry." See Kuchera v. Jersey Shore Family Health Ctr., 221 N.J. 239, 252 (2015). Although some nonprofits "provide a wide range of services beyond their core purpose," such activities do not eviscerate their entitlement to immunity "as long as the services or activities further the charitable objectives [the entities were] organized to advance." Id. at 252-53 (citing Bieker, 169 N.J. at 175).

18

In Bloom v. Seton Hall University, for example, the Appellate Division found that Seton Hall was entitled to charitable immunity as a nonprofit educational institution from a claim brought by a student injured at a campus pub. 307 N.J. Super. 487, 490-92 (App. Div. 1998). Noting that courts have "afforded to nonprofit institutions, whether educational, religious or charitable, substantial latitude in determining the appropriate avenues for achieving their objectives," id. at 491, the Bloom panel found "it consistent with reasonable educational goals for a university to conclude that a campus experience ought to include opportunities to mature in an environment enriched not only by study and classes, but by diverse forms of social interchange within the university setting," id. at 492.

In Orzech v. Fairleigh Dickenson University, a panel similarly reasoned "that the provision by a college or university of dormitory housing for its students falls within the broad range of reasonable educational goals" because it "provide[s] opportunities for students to live in an environment with other students, share experiences, broaden their horizons by living and interacting with other students of diverse backgrounds, and maturing as young adults." 411 N.J. Super. 198, 207 (App. Div. 2009). The panel thus held that "a dormitory resident injured in the dormitory as a result of the negligence of the

19

university or its employees or agents would generally be barred from suing the university or its employees or agents." Id. at 208.

In other cases, the broad term "educational" has been applied to a rope and ladder climb at a Boy Scout exhibition, Stoolman v. Camden Cty. Council Boy Scouts of Am., 77 N.J. Super. 129, 135 (Law Div. 1962) ("[T]he term[s] 'educational' and 'recreation' are not mutually exclusive but rather are overlapping."); daily craft and game activities offered by a religious camp, Rupp v. Brookdale Baptist Church, 242 N.J. Super. 457, 465 (App. Div. 1990) (noting that the "crafts and games" fostered "sportsmanship, honesty and creativity" and were thus "educational for purposes of the [Charitable Immunity Act]"); and an aquarium, Morales v. N.J. Acad. of Aquatic Scis., 302 N.J. Super. 50, 54 (App. Div. 1997) (finding that the New Jersey Academy of Aquatic Sciences "was organized exclusively for charitable and educational purposes and that it operates [its] Aquarium in furtherance of those beneficent purposes").

And in a case similar to the one before us, the Appellate Division held that Princeton University was "entitled to immunity from a claim arising out of the rental of an auditorium to another non-profit entity that use[d] the facility for . . . educational purposes" -- a concert. Lax, 343 N.J. Super. at 573.

In Lax, the Appellate Division stated that the Princeton Chamber Symphony was a nonprofit corporation that rented an auditorium from Princeton University, also a nonprofit corporation, for approximately $5000 per concert. Id. at 569. The plaintiff in that case, who was not a Princeton student, purchased a ticket and attended a Symphony concert, where the plaintiff fell. Id. at 570. The panel found that the plaintiff's subsequent tort claims were barred by charitable immunity as to both the orchestra and the university. Id. at 572.

In holding that the concerts performed by the Symphony were educational, the panel acknowledged that concerts could be viewed as a form of entertainment or recreation. Id. at 571. The panel found that the concerts were nevertheless "clearly 'educational' and 'charitable' within the intent of the Charitable Immunity Act." Ibid. Noting the wide array of organizations found to have educational and charitable purposes, id. at 571-72, and stressing that "[a] performance of classical music provides a cultural and educational experience for patrons of this form of artistic production," the court found that the orchestra was organized and operated for charitable purposes and entitled to charitable immunity, id. at 572.

The Lax panel also found that Princeton University was entitled to immunity from the plaintiff's suit. Id. at 573. Noting that "[t]heatrical

21

productions, concerts, and other artistic performances are an integral part of the educational life of a university," the panel reasoned that "if the University presented its own chamber music production of classical music at [the auditorium], there would be no doubt such a production would be considered part of its educational program." Ibid. Nor did the court find it problematic that the university had rented its auditorium to the orchestra: citing Bieker -- in which this Court determined that a nonprofit entity that rents meeting rooms and facilities "to charitable organizations, for-profit entities, and the general public," 169 N.J. at 170, would be entitled to charitable immunity unless rentals to for-profit entities were the dominant use, id. at 179 -- the Lax panel reasoned that the university would not lose its immunity as a nonprofit educational institution simply because it had rented its auditorium to "another non-profit entity that uses the facility for similar educational purposes." Lax, 343 N.J. Super. at 573.

The Lax court's ruling as to Princeton University and the other opinions described above focused on the third prong of the charitable immunity test and provide examples of the breadth of activities that can be considered to advance educational purposes. Further illustration of the scope of the term "educational" can be found in cases focused on the second prong of the

immunity test -- whether institutions are "organized exclusively for educational purposes."

This Court interpreted that phrase in <u>Ryan</u>, 175 N.J. at 347. The <u>Ryan</u> Court noted that while the Charitable Immunity Act groups religious, charitable, and educational purposes all together, N.J.S.A. 2A:53A-7, "educational" and "religious" are "specific as to subject matter," whereas "charitable" is "a generic catchall term." <u>Id.</u> at 343. The Court reasoned that "educational" and "religious" have "limited and commonly understood meaning[s]," <u>ibid.</u>, and should thus be read literally, <u>id.</u> at 346.

The Court then noted that the term "educational" has been interpreted broadly as in <u>Pomeroy v. Little League Baseball of Collingswood</u>, 142 N.J. Super. 471, 474 (App. Div. 1976). In that case, the Appellate Division panel found that the Little League had an exclusively educational purpose because it taught "young people the ideals of good sportsmanship, honesty, loyalty, courage and reverence," and its educational purpose was not vitiated simply because it "was accomplished through the teaching of athletic skills." <u>Ryan</u>, 175 N.J. at 347 (discussing <u>Pomeroy</u>).

The <u>Ryan</u> Court went on to hold that a "group of parents and expectant mothers organized to exchange experiences and receive information regarding childbirth, child rearing, mothering, and family relationships" was an

23

educational organization. Id. at 336-37, 347. The Court reasoned that "the form that education takes," such as discussion, "is not a touchstone for qualifying for immunity." Id. at 348. Nor was it relevant that the subject was not academic in nature. Ibid. The Court noted that the organization stated it had an educational purpose in its bylaws, offered focused discussions directed by facilitators and experienced group members, and provided some lectures. Id. at 347-48. The Court also noted that the ancillary services the organization provided advanced its educational mission. Id. at 349. The Ryan Court thus found that the organization under consideration was entitled to charitable immunity. Ibid.

The Appellate Division likewise discussed what constitutes an educational purpose in Auerbach v. Jersey Wahoos Swim Club, in which the court considered whether a swim club was organized for exclusively educational purposes. 368 N.J. Super. 403 (App. Div. 2004). The club identified its primary purpose as "promot[ing] and teach[ing] swimming." Id. at 408.

The court opined that "the term 'educational' . . . [is] not limited to purely scholastic activities," id. at 411 (alterations in original) (quoting Bloom, 307 N.J. Super. at 492), and remarked that, "[w]hile an entity cannot assert merely that '"life" is [the] educational experience,'" id. at 411-12 (quoting

24

Kirby v. Columbian Inst., 101 N.J. Super. 205, 210 (Law Div. 1968)), "'educational' has been broadly defined to include" a wide array of activities, id. at 412. The panel additionally noted that an organization may be promoting exclusively educational purposes even though providing an educational experience that is "recreational" in nature. Id. at 412. Finally, the panel explained that physical education and athletics were part of a school's curriculum and therefore fell within the broad definition of "educational." Id. at 413. The panel concluded that the swim club aimed to teach its members swimming and aquatic skills, and that it was therefore educational. Ibid.

Cumulatively, the decisions described above reflect the liberal construction the Legislature has prescribed for the Charitable Immunity Act. See N.J.S.A. 2A:53A-10. Courts have found institutions offering an array of services to be educational in nature and have found a broad variety of activities offered by educational institutions to advance their educational objectives.

ii.

The second portion of the third prong of the charitable immunity test focuses on whether the plaintiff was benefitting from the institution's educational works when he or she was injured.

The notion of who is a beneficiary of a charity's works "is to be interpreted broadly, as evidenced by the use of the words 'to whatever degree'

modifying the word 'beneficiary' in the [Charitable Immunity Act]." Ryan, 175 N.J. at 353 (discussing N.J.S.A. 2A:53A-7). "Those who are not beneficiaries must be 'unconcerned in and unrelated to' the benefactions of such an organization." Ibid. (quoting Gray v. St. Cecilia's Sch., 217 N.J. Super. 492, 495 (App. Div. 1987)). Pursuant to this expansive view, courts will typically find Ryan's third prong met if the plaintiff's "'presence was clearly incident to accomplishment' of the defendant's charitable purposes." Bieker, 169 N.J. at 180 (quoting Gray, 217 N.J. Super. at 495).

Our case law is evidence of this. See ibid. (the three-year-old plaintiff was "plainly a recipient" of a community center's "'benefactions' even if only as a companion of his father and a spectator at his father's basketball game"); Pomeroy, 142 N.J. Super. at 475 ("[A] spectator at a Little League baseball game is a beneficiary of defendant's works since . . . at the time [she] was injured defendant was engaged in . . . the charitable objectives it was organized to advance."); Peacock v. Burlington Cty. Historical Soc'y, 95 N.J. Super. 205, 207-09 (App. Div. 1967) (a woman who accompanied her husband to a historical society library to "keep him company and to enjoy an automobile ride" and who "casually viewed exhibits and maps" while waiting for him was a beneficiary of the society's works even though "she had not the slightest interest" in the information her husband sought); Anasiewicz, 74 N.J.

26

Super. at 537-38 (holding that a wedding guest was a beneficiary of charitable benefactions of Sacred Heart Church).

Courts also consider, but are not bound by, the purposes set forth in the organization's certificate of incorporation. DeVries, 290 N.J. Super. at 484-85. Otherwise, every non-profit corporation "could unilaterally insulate itself from tort liability merely by setting forth a comprehensive list of beneficiaries sufficiently broad to include all possible claimants." Id. at 484.

And charitable immunity can still apply "even where the person has paid for the services rendered by the charity." Loder v. St. Thomas Greek Orthodox Church, 295 N.J. Super. 297, 302-03 (App. Div. 1996) (quoting Casper v. Cooper Hosp., 26 N.J. Super. 535, 540 (App. Div. 1953)); see also Hauser v. YMCA, 91 N.J. Super. 172, 176-78 (Law Div. 1966) (finding that the plaintiff's "paying guest status" did not deprive the YMCA of its charitable immunity).

## IV.

At issue in this matter is the third prong of N.J.S.A. 2A:53A-7(a), whether the University "was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works." At the outset, we repeat that the Charitable Immunity Act is to be liberally construed and that the phrase "educational purpose" has been

27

interpreted broadly. Applying those legal principles to the facts and circumstances of this case, we conclude that the majority of the Appellate Division panel was correct in its determination.

In Monmouth University's certificate of incorporation, the University expressly states that its "purposes" include the establishment and maintenance of an institution that promotes education, including "general cultural education," as well as "provid[ing] for the holding of meetings and events open to the public . . . all calculated, directly or indirectly, to advance the cause of education and wholesome recreation." While the purpose set forth in an organization's certificate of incorporation is not conclusive, the organization's stated purpose is a useful factor for courts to consider. See DeVries, 290 N.J. Super. at 485.

Here, the underlying event was a concert, which is undisputedly an activity encompassed by the University's certificate of incorporation as an event that furthered the University's educational purpose. Just as the Appellate Division in Lax found the Chamber Symphony to be "educational" and "charitable" under the Charitable Immunity Act, the McBride concert is afforded similar status.

As the majority stated, "[w]hether classical, country, or Christmas, music is an art, and McBride is a musical artist. Thus, McBride's concert was

28

'a cultural and educational experience.'" Green, 452 N.J. Super. at 552 (quoting Lax, 343 N.J. Super. at 572). The McBride concert served the University's stated goals of presenting concerts open to the public to advance the cause of education.

Further, as the majority correctly observed, courts should not be in the business of deciding what music constitutes "educational" music and what does not. By accepting the premise that all music is art, regardless of whether it is country music, classical, rap, or some other type, courts can avoid going down the proverbial rabbit hole of determining what music is considered artistic, and what is not. See id. at 552 n.3. Nor does it matter whether the music comes from a mainstream, commercially successful performer or a nonprofit group. The outcome is the same. That is why we do not agree with the dissent, which found that the McBride concert serves no educational purpose or endeavor. Id. at 552. Requiring courts to engage in such an analysis is problematic.

While the Legislature never intended the Charitable Immunity Act to be limitless, the Act is to be liberally construed, and we believe that today's ruling is in step with the Act's legislative intent. We hold that the underlying concert was promoting the University's educational objectives and purposes at

29

the time of Green's injury, and as a result, Monmouth University is afforded charitable immunity.

Furthermore, we agree with the majority that Monmouth University's decision to rent out the MAC to host the Martina McBride concert did not result in the loss of the University's charitable immunity. A charitable entity should be allowed to contract with third-party, for-profit entities to help facilitate the logistics of establishing and running a charitable event -- like a concert -- inasmuch as certain third parties undoubtedly have certain resources, contacts, and expertise that a charitable entity may not possess. If hiring third-party professionals triggers the loss of an entity's immunity status, non-profits in turn will be dissuaded from presenting religious, charitable, or educational events, which is contrary to the Legislature's intent.

We also note that our decision is not at all based on whether the University here made a profit or lost money on the Martina McBride concert. The Legislature could have set up the Charitable Immunity Act to turn on such issues, but it did not.

Finally, although Green was not a Monmouth University student, she was a beneficiary under the language of the Charitable Immunity Act. This is well supported by our case law interpreting the language of the Charitable Immunity Act, as previously noted.

30

V.

For the reasons set forth, the judgment of the Appellate Division is affirmed.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion. JUSTICE ALBIN did not participate.

31