NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1152-20

PREMIER PHYSICIAN
NETWORK, LLC,

      Plaintiff-Respondent,

v.

ROBERT MARO, JR., M.D.,

      Defendant-Appellant.

_____

PREMIER PHYSICIAN
NETWORK, LLC,

      Plaintiff-Respondent,

v.

TIMOTHY SHACK, M.D.,

      Defendant-Appellant.

_____

<table>
<tr><td><b>APPROVED FOR PUBLICATION</b></td></tr>
<tr><td><b>May 26, 2021</b></td></tr>
<tr><td><b>APPELLATE DIVISION</b></td></tr>
</table>

      Argued March 9, 2021 – Decided May 26, 2021

      Before Judges Fisher, Moynihan, and Gummer.

      On appeal from the Superior Court of New Jersey,
      Law Division, Camden County, Docket Nos. L-0166-
      18 and L-0167-18.

Peter M. Rhodes argued the cause for appellants (Cahill, Wilinski, Rhodes & Joyce, PA, attorneys; Peter M. Rhodes, on the brief).

Robert G. Kenny argued the cause for respondent (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Michael J. Baker, of counsel; Richard J. Mirra, on the brief).

The opinion of the court was delivered by

GUMMER, J.S.C., (temporarily assigned)

Because the court misinterpreted statutory law[1] in determining a draft operating agreement was the operating agreement of a limited liability company (LLC), and because a genuine issue of material fact exists as to whether and when a draft operating agreement became the operating agreement of plaintiff Premier Physician Network, LLC (PPN), we reverse the trial court's order granting in part plaintiff's partial summary-judgment motion and affirm its order denying defendants' partial summary-judgment cross-motion. Finding no abuse of discretion, we affirm the order compelling production of defendants' tax returns.

For the appeal of the order granting plaintiff's summary-judgment motion, we take the facts from the record, viewing them in a light most favorable to defendants, the non-moving parties. Green v. Monmouth Univ.,

---

[1] The Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-1 to -94 (the Act).

237 N.J. 516, 529 (2019); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Defendants Robert Maro and Timothy Shack were partners with four other physicians in a medical practice called Robert J. Maro, M.D., P.A. (Maro Group). Sometime in or around August 2014, defendants and their partners were approached about forming an organization with other doctors that would allow them to save on costs and receive higher reimbursement from insurers. That organization ultimately was PPN, which was created as a limited liability company by the filing of a certificate of formation with the New Jersey Division of Revenue on August 12, 2014.

Maro and other physicians signed a Letter of Intention Agreement (LOI) on or about October 16, 2014.[2] Its introductory paragraph stated the LOI was "intended to set forth in principle the terms of a proposed transaction involving each of the physicians . . . who sign counterparts of this [LOI], pursuant to which the [physicians] intend to participate [in] a multi-specialty medical group [PPN]." Paragraph one of the LOI set forth the purpose of PPN: to

---

[2] The LOI appears to have been executed by Drs. Catherine Montgomery, Eduardo Enriquez, Andrew Blumenthal, Toby Soble, Joseph Costabile, Lisa Dructor, Sean Goudsward, Barbara Winfield, Mark Todt, Terence Schiller, Keith Damerau, Thomas P. McMahon, MaryAnn McMahon, and defendant Maro. Shack's signature does not appear on the copy of the LOI in defendants' appellate appendix but in their brief defendants assert he signed it. In its brief, plaintiff acknowledges Shack joined PPN with the rest of the Maro Group.

A-1152-20

"form a multi-specialty medical group, intended to provide increased financial stability to its members and improved patient care and outcomes, by partnering with insurance companies and other stakeholders, developing ancillary services, leveraging economies of scale, facilitating practice coverage . . . and developing superior back office management and IT support." Paragraph two provided that a signature on the LOI "will constitute that person's consent to the terms contained in this [LOI]" and that after at least four people signed the LOI, the signors and the identified "[o]rganizers"[3] "will initiate negotiation and preparation of a definitive operational agreement (the 'Definitive Agreement') and any other collateral agreement(s) necessary and proper to facilitate the formation and commencement of the professional and business affairs of [PPN]." Paragraph four stated "the parties will use good faith efforts to execute the Definite [sic] Agreement prior to December 13, 2014," and "[i]f the parties are unable to negotiate and execute the Definitive Agreement by such date, any [s]ignatory, for any reason whatever, with or without cause, may terminate negotiations as to their participation in [PPN] by written notice to the [o]rganizers." Paragraph seven specified, "[s]ubsequent to the execution of this [LOI], and in connection with the negotiation and preparation of the

---

[3] The "[o]rganizers" were identified as Enriquez, Costabile, Soble, Blumenthal, and Montgomery.

A-1152-20

Definitive Agreement and related documents, [the physician] agrees to negotiate diligently and in good faith the terms of the Definitive Agreement, which negotiation is expected to involve . . . prompt review of and response to proposed agreements and other undertakings.  Notwithstanding the foregoing, [the physician] shall not be under any obligation to continue with his/her involvement if he/she [sic] the terms of the proposed Definitive Agreement are not satisfactory . . . for any reason in his/her sole discretion."  Paragraph ten stated the "[i]ntent of [p]arties":

> The agreements set forth in Paragraphs [three, four, and five] of this [LOI] shall be binding legal obligations of the parties hereto.  The remaining portions of this [LOI] are intended only as guidelines for the drafting and execution of a Definitive Agreement and are not intended to and shall not constitute a binding legal obligation, which shall only arise upon the execution and delivery of the Definitive Agreement.  While the concepts expressed in this [LOI] represent the mutual understanding of the parties to date, it is not intended that the specific language of the provisions shall not be negotiated, and the specific terms of the Definitive Agreement are finally subject to the mutual approval of all parties thereto.

Paragraph twelve provided:  "[t]his Agreement contains the entire agreements among the parties relating to the subject matter thereof and supersedes all prior agreements or commitments.  This Agreement may not be amended or modified except by a writing executed by all Signatories."

A-1152-20

On January 9, 2015, William Febus, CEO of PPN, sent an email to several email addresses, including addresses appearing to belong to defendants.[4] In the email, Febus included an agenda for a January 12, 2015 meeting; the first subject on the agenda was "[o]perating [a]greement." On January 21, 2015, Febus sent an email with the subject "Schoppmann's Response," stating he had attached comments "from our attorney Kern Augustine Conroy and Schoppmann," referencing a teleconference meeting the next evening, and advising "I have not received the [forty-two] concerns regarding the Operating Agreement. Once[] I receive them[,] I will send them to everyone along with a copy of my contract. If you have any questions or concerns, please let me know."[5]

On January 26, 2015, Febus sent an email with the subject "Operating Agreement," asking the recipients to review an attached draft operating agreement:

> I have attached the Operating Agreement with the
> changes per our phone call this past Thursday evening.

---

[4] Two addresses appear to be defendants' email addresses because they include defendants' names. During oral argument, defendants' counsel did not deny those addresses were defendants' addresses.

[5] According to Lisa A. Dructor, D.O., who identifies herself as a former member of the Maro Group and PPN, the attached document included a response by PPN's attorneys to comments from Montgomery's personal attorney.

A-1152-20

Since, there is a possibility of tomorrow being a snow day then tomorrow will be a great opportunity to review the Agreement. Time is [of] the essence and I need to have [these] documents to our Insurance carriers . . . by the middle of this [sic] to have everything in place for February 1st. So, I have our carriers pick them this week. If you have any questions, please do not hesitate to contact me.

Section 1.63 of the draft defined "Member" as "a person executing this Agreement or a Joinder Agreement as an existing Member or a new Member, the Member Services Agreement and an Asset Contribution Agreement, if applicable, as directed by the Board of Managers." Section 2.5 of the draft stated "[a]ll current Members of [PPN] . . . shall be listed on the most current attached Exhibit A . . . ." The Exhibit A attached to the draft did not contain any names.

In support of its motion for partial summary judgment, plaintiff submitted the certification of its attorney, who certified that "a true and accurate copy of the Operating Agreement of [PPN] dated January 1, 2015"[6] was attached. That document, which had an effective date of January 1, 2015, contains signatures, none of which is dated. Exhibit A attached to the

---

[6] Counsel did not explain how he would have personal knowledge the attached document was "a true and accurate copy" of PPN's operating agreement. See R. 1:6-6 (stating a court may consider "affidavits made on personal knowledge, setting forth only facts . . . to which the affiant is competent to testify").

document sets forth a "LIST OF MEMBERS," which does not include defendants.

Defendants did not execute the operating agreement.[7] Defendants assert in their appellate brief they had not seen the operating agreement until this litigation began. Maro testified he had seen the operating agreement before his deposition but not before he joined PPN. During his deposition, Shack testified he did not recall seeing or signing the operating agreement. The record does not contain any proof the signed copy of the purported operating agreement was sent to defendants.

Between January 1, 2015, and January 22, 2016, defendants submitted insurance-claim billings to PPN, cash payments for deposit in PPN accounts, and credit-card payments for deposit through PPN's credit-card company system. During that time, PPN handled the billing, collection, and accounts-payable work for defendants and paid their malpractice insurance premiums and rent for the building where they practiced. Employees from the former Maro group were paid by PPN. On April 16, and April 22, 2015, respectively,

---

[7] The trial court found "the final draft of the agreement that ultimately was signed by everyone, except for [defendants], was circulated." It is not clear to us what the trial court meant by "everyone." Some people, other than defendants, who had signed the LOI did not sign the operating agreement, and some people who were listed as members in Exhibit A of the purported operating agreement had not signed the LOI.

A-1152-20

Maro and Shack executed a personal guaranty agreement with Choice Health Finance on behalf of PPN. PPN issued K-1's to defendants for 2014, 2015, and 2016. After January 22, 2016, defendants stopped submitting payments to PPN and returned "to practicing on their own" in February 2016.

Plaintiff filed complaints against defendants, alleging they had joined PPN as members on or about January 1, 2015, were bound by plaintiff's operating agreement, and owed plaintiff any "[s]hortfall [a]mount" and penalties for giving less than ninety-days' notice of their withdrawal and for withdrawing after the first anniversary and before the third anniversary of PPN's creation. Defendants filed answers, denying they were bound by the operating agreement or owed plaintiff any money, and counterclaims, asserting plaintiff's "total failure to uphold its promises" caused them to "expend large sums of money to revamp their offices, attempt to collect its accounts receivable and other expenses." The court later consolidated the cases.

Before the close of discovery, plaintiff moved to compel production of defendants' 2014, 2015, and 2016 tax returns. Plaintiff also moved for partial summary judgment, asking the trial court to find defendants were members of PPN from January 1, 2015, until at least January 22, 2016, were bound by the operating agreement, voluntarily withdrew on January 22, 2016, and owed plaintiff a shortfall amount, penalties, and attorneys' fees based on the terms of

the operating agreement. Defendants opposed plaintiff's motions and cross-moved for a protective order to prevent disclosure of their tax returns and for partial summary judgment, seeking an order declaring the operating agreement void and dismissing the complaint with prejudice.

After hearing oral argument, the trial court rendered an oral opinion. Relying primarily on the language of N.J.S.A. 42:2C-12(b), which states "[a] person that becomes a member of a limited liability company is deemed to assent to the operating agreement," the court held "all members of the LLC in this case are deemed to have assented to the operating agreement," including defendants even though they had not signed it. The trial court reached that conclusion even though it also found "[t]here's a material issue as to whether or not [Maro] ever agreed to the operating agreement so that the definition of operating agreement came into effect." The trial court determined defendants had to produce "any tax documents that they intend to use in their counterclaim."

On November 13, 2020, the court issued orders granting in part plaintiff's motion for partial summary judgment: finding defendants were members of PPN "in 2014 and at all relevant times set forth in the [c]omplaint" and were bound by the operating agreement "drafted and circulated in or about January 2015" even though they had not executed it; denying without prejudice

10

plaintiff's request for damages and fees; granting plaintiff's motion to compel production of defendants' tax returns, requiring defendants to produce their tax returns if they or their expert "intend to use any information contained within these tax returns at trial or in the preparation of any expert report"; and denying defendants' cross-motions for summary judgment and a protective order. We granted defendants' motion for leave to appeal.

We review a grant of summary judgment using the same standard that governs the trial court's decision. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018). Under that standard, summary judgment will be granted when "the competent evidential materials submitted by the parties," viewed in the light most favorable to the non-moving party, show there are no "genuine issues of material fact" and that "the moving party is entitled to summary judgment as a matter of law." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014); see also Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017); R. 4:46-2(c).

"An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande, 230

11

N.J. at 24 (quoting R. 4:46-2(c)).  We owe no special deference to the trial court's legal analysis.  RSI Bank, 234 N.J. at 472.

The resolution of this appeal depends on the meaning of language contained in the Act.  N.J.S.A. 42:2C-2 defines "[o]perating agreement" as

> the agreement, whether or not referred to as an operating agreement and whether oral, in a record, implied, or in any combination thereof, of all the members of a limited liability company, including a sole member, concerning the matters described in subsection a. of section 11 of this act.  The term includes the agreement as amended or restated.

N.J.S.A 42:2C-12(b) provides:  "[a] person that becomes a member of a limited liability company is deemed to assent to the operating agreement."

Our "paramount goal" in interpreting a statute is to determine the "Legislature's intent."  DiProspero v. Penn, 183 N.J. 477, 492 (2005).  To achieve that goal, "we start with the words the Legislature used."  Simadiris v. Paterson Pub. Sch. Dist., 466 N.J. Super. 40, 45 (App. Div. 2021).  In reviewing the Legislature's words, we follow the "bedrock assumption that the Legislature did not use 'any unnecessary or meaningless language.'"  Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 587 (2013) (quoting Patel v. N.J. Motor Vehicle Comm'n, 200 N.J. 413, 418-19 (2009)).  We "must presume that every word in a statute has meaning and is not mere surplusage," In re Att'y Gen.'s "Directive on Exit Polling: Media & Non-

A-1152-20

Partisan Pub. Int. Grps.", 200 N.J. 283, 297-98 (2009), and we "give effect to every word" so we do not "construe the statute to render part of it superfluous." Med. Soc'y of N.J. v. N.J. Dep't of Law & Pub. Safety, 120 N.J. 18, 26-27 (1990). We cannot "rewrite a plainly written statute" or "presume that the Legislature meant something other than what it conveyed in its clearly expressed language." Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012); see also DiProspero, 183 N.J. at 492 (finding courts cannot add language to a statute). We also "ascribe to the statutory words their ordinary meaning and significance . . . and read them in context with related provisions so as to give sense to the legislation as a whole." DiProspero, 183 N.J. at 492.

To adopt the trial court's interpretation of the Act, we would have to ignore the Legislature's use of the word "all" in its definition of operating agreement in N.J.S.A. 42:2C-2, or we would have to read into the Act a provision that says a majority of members, instead of "all the members," can vote to adopt a draft operating agreement. But we can't do either because courts don't have the authority to ignore language the Legislature included and don't have authority to graft onto a statute language the Legislature chose not to include.

Applying the actual and complete statutory language, we hold a draft operating agreement does not become the operating agreement of an LLC

unless it is "the agreement . . . of all the members of" the LLC, N.J.S.A. 42:2C-2, meaning "all the members" have to agree to it.[8]   If all existing members do not agree to the draft agreement when it is proposed, then the draft operating agreement remains just that – a draft agreement; it never becomes the operating agreement of the LLC.  If all members agree to a draft operating agreement, it then becomes the operating agreement of the LLC and any subsequent members are bound by the already-existing operating agreement.  If the court's finding that defendants were members of PPN in 2014 is correct and if defendants' assertion that they never agreed to the draft operating agreement, which the trial court found was "drafted and circulated in

---

[8]  Our reading of the Act is consistent with commentary to the parallel sections of the Uniform Limited Liability Company Act (2006) (amended 2013) (Nat'l Conf. of Commr's on Unif. State Ls., Draft Aug. 19, 2015) (ULLCA). Compare N.J.S.A. 42:2C-2 and -12(b) with ULLCA §§ 102(13) and 106(b); see also ULLCA § 102 cmt. (para. 13) (describing § 106(b) as "deeming new members to assent to the then-existing operating agreement" and noting "[a]n agreement among less than all members might well be enforceable among those members as parties, but would not be part of the operating agreement") and § 106 cmt. (b) ("a person becoming a member of an existing limited liability company should take precautions to ascertain fully the contents of the operating agreement").  A person "becoming a member of an existing" LLC can "ascertain . . . contents of the operating agreement" only if the original existing members of the LLC already have agreed to and adopted the operating agreement.  Id. at § 106 cmt. (b) (emphasis added).  Even if a rudimentary operating agreement is deemed to exist on the formation of an LLC, see id. at § 102 cmt. (para. 13), that rudimentary operating agreement would require the "consent of all the members" to amend it, see id. at § 407(b)(4)(B).  Compare ULLCA § 407(b)(4)(B) with N.J.S.A. 42:2C-37(b)(5).

or about January 2015," is correct, then the draft agreement was not the agreement of "all the members" and it never became the operating agreement of PPN.

The Act does not specify how the members must indicate their agreement to a draft operating agreement in order to render it effective. It does not require their agreement to be bound by an operating agreement be in writing or that it be executed by them. In fact, the operating agreement itself need not be written and may be oral. N.J.S.A. 42:2C-2 (including "oral" agreement in definition of operating agreement).

A party to a contract can show assent to the terms of a contract in writing, verbally, or by their acts. Skuse v. Pfizer, Inc., 244 N.J. 30, 50 (2020). The parties concur defendants did not agree in writing or verbally to the draft operating agreement. They dispute whether defendants' actions constituted consent to the draft operating agreement. Because of that genuine dispute[9] and because the trial court incorrectly interpreted N.J.S.A. 42:2C-12(b), we reverse its order granting in part plaintiff's motion for partial

---

[9] The trial court briefly touched on defendants' actions. Given the fleeting nature of that reference, the trial court's finding of a material issue as to whether Maro agreed to the draft operating agreement, and the court's repeated reference to the language of N.J.S.A. 42C:2C-12(b) as the basis of its decision, we do not view the court's cursory allusion to defendants' conduct as a resolution of this issue.

summary judgment and affirm its order denying defendants' cross-motion for partial summary judgment.

"A [trial] court's discovery rulings should not be reversed on appeal absent an abuse of discretion or a mistaken understanding of the applicable law." Bayer v. Twp. of Union, 414 N.J. Super. 238, 272-73 (App. Div. 2010); see also Capital Health Sys. v. Horizon Healthcare Servs., 230 N.J. 73, 79-80 (2017). Discovery rules "are to be construed liberally in favor of broad pretrial discovery." Payton v. N.J. Tpk. Auth., 148 N.J. 524, 535 (1997); see also Capital Health Sys., 230 N.J. at 80. Discovery includes the obtaining of any information, not privileged, relevant to the subject matter involved in the pending action including information related to a party's claim. See R. 4:10-2(a). The scope of discovery, however, is not infinite. Bayer, 414 N.J. Super. at 272. Rule 4:10-3 allows a court to prevent the disclosure of certain discoverable information "for good cause shown . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." "Good cause" is determined on a case-by-case basis. Ullmann v. Hartford Fire Ins. Co., 87 N.J. Super. 409, 414 (App. Div. 1965).

The "[d]isclosure of a litigant's tax return is . . . a highly sensitive endeavor." Campione v. Soden, 150 N.J. 163, 190 (1997). Generally, "[a] taxpayer is entitled to nondisclosure of his or her [tax] return absent a 'strong

need' for information contained in the return." Ibid. (quoting Ullmann, 87 N.J. Super. at 415). But the production of tax returns can be ordered if "it clearly appears they are relevant to the subject matter of the action or to the issues raised thereunder, and further, there is a compelling need therefor because the information contained therein is not otherwise readily obtainable." Ullmann, 87 N.J. Super. at 415 (quoting Cooper v. Hallgarten & Co., 34 F.R.D. 482, 484 (S.D.N.Y. 1964)); see also Campione, 150 N.J. at 189-90.

We see no abuse of discretion in the trial court's order requiring the production of defendants' tax returns if they or their expert witnesses "intend to use any information contained within these tax returns at trial or in preparation of any expert report." The trial court recognized the sensitive nature of the production of tax returns and appropriately narrowed the circumstances of their production. Neither the judge's ruling nor ours precludes the taxpayer from seeking redaction of any parts of the relevant tax returns so as to protect the taxpayer's privacy about information within those documents that is irrelevant or not likely to lead to the discovery of relevant information.

Affirmed in part as to the orders denying defendants' summary judgment motion and compelling defendants to produce their tax returns; reversed in part as to the order granting in part plaintiff's motion for summary judgment;

17

remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18