# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3055-18

KENNETH FRANCO, an
incapacitated individual, by
his GUARDIANS AD LITEM,
CECILIA GRIGLAK and
PATRICK GRIGLAK, and
CECILIA GRIGLAK and
PATRICK GRIGLAK, individually,

      Plaintiffs-Appellants,

v.

FAIRLEIGH DICKINSON
UNIVERSITY, FRANK DADES,
DOMINICK STELLACCIO,
JASON MISENER, MATTHEW
PIERONI, RACHEL LISTMAN,
MATTHEW SMIGELSKI,
SPENCER GOLDIN, JAMES
FRISBY, MICHAEL DACOSTA,
JOSEPH PISERCHIO and ALENA
RAMOS,

      Defendants-Respondents,

and

UPSILON HEXATON CHAPTER
OF PHI SIGMA KAPPA
FRATERNITY, THE GRAND
CHAPTER OF PHI SIGMA KAPPA,
INC., CRAIG FELMING, JKL
TAVERN, UNITED RENTALS

**APPROVED FOR PUBLICATION**

**March 25, 2021**

**APPELLATE DIVISION**

(NORTH AMERICA), INC.,
TILCON NEW YORK, INC.,
FLORHAM PARK LIQUORS,
DANISHEK BROTHERS, INC.,

    Defendants.

_____

           Argued December 15, 2020 — Decided March 25, 2021

           Before Judges Gilson, Moynihan, and Gummer.

           On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5362-16.

           Raymond S. Vivino and Leonard P. Rosa argued the cause for appellant (Vivino & Vivino, LLC, and Hartman Doherty Rosa Berman & Bulbulia, LLC, attorneys; Raymond S. Vivino, and Leonard P. Rosa, on the briefs).

           Angelo A. Stio, III argued the cause for respondent Fairleigh Dickinson University (Troutman Pepper Hamilton Sanders, LLP, and Post & Schell, PC, attorneys; Angelo A. Stio, III, and Richard B. Wickersham, Jr. on the brief).

           Peter E. Mueller argued the cause for respondent Frank Dades, Shannon M. Burke argued the cause for respondent Matthew Pieroni, and Cynthia J. Birkitt argued the cause for respondent Dominick Stellaccio (Harwood Lloyd, LLC, Gaul, Baratta & Rosello, LLC, and Law Offices of James H. Rohlfing, attorneys; Peter E. Mueller, Joseph M. Gaul, Jr., Shannon M. Burke, and Stephen C. Cahir, of counsel and on the joint brief).

A-3055-18

Carolyn Kelly Bogart argued the cause for respondent Jason Misener (Marshall Dennehey Warner Coleman & Goggin, attorneys; Carolyn Kelly Bogart, on the brief).

Ryan J. Gaffney argued the cause for respondent Rachel Listman (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; Ryan J. Gaffney, on the brief).

John Burke argued the cause for respondent Spencer Goldin (Burke & Potenza, PA, attorneys; John Burke, on the brief).

Thomas W. Griffin argued the cause for respondent James Frisby (Litvak & Trifiolis, PC, attorneys; Thomas W. Griffin, on the brief).

Michael A. Graziul, II argued the cause for respondent Michael DaCosta (Law Offices of Patricia A. Palma, attorneys; Michael A. Graziul, II, on the brief).

Lewis M. Markowitz argued the cause for respondent Joseph Piserchio (Campbell, Foley, Delano & Adams, LLC, attorneys; Helen A. Cummings, and Lewis M. Markowitz, on the brief).

Carmen E. Mendiola, attorney for respondent Alena Ramos, joins in the briefs of respondents Fairleigh Dickinson University, James Frisby, Michael DaCosta and Joseph Piserchio.

The opinion of the court was delivered by

GILSON, J.A.D.

This appeal raises questions concerning the scope of the duty owed to an adult who is not old enough to drink legally but who nonetheless drinks alcohol

to excess and injures himself in a motor-vehicle accident. The issues on this appeal are governed by the common law and related public policies. The Social Host Liability Act (SH Act), N.J.S.A. 2A:15-5.5 to -5.8, does not apply because it governs liability for third-party injuries resulting from the service of alcohol to an of-age adult.[1]

In September 2014, Kenneth Franco, a twenty-year-old college student, attended a social gathering in a suite in a residential hall at Fairleigh Dickinson University (FDU or the University). Franco had informed the suitemates and his parents that he planned to spend the night in the suite. In addition to bringing an overnight bag, Franco brought and consumed alcohol. He became visibly intoxicated and then fell asleep on a couch in the suite. Sometime later, the suitemates and remaining guests either left or went to sleep. At approximately 5 a.m., Franco awoke, left the suite, and forty-seven minutes later was severely injured when his car went off the road, struck an unoccupied parked vehicle, and flipped over.

Franco and his parents appeal from a series of orders that granted

---

[1] New Jersey considers persons to be an adult when they are eighteen years of age or older. N.J.S.A. 9:17B-3. Persons can legally purchase and consume alcohol when they are twenty-one years of age or older. N.J.S.A. 9:17B-1(b). Accordingly, an "of-age adult" is someone twenty-one years of age or older.

summary judgment to FDU, four student residential assistants (RAs), four student suitemates (the Suitemates), and three other students who attended the gathering as guests. Franco contends that the University and the students had a duty to take action that would have prevented him from driving while drunk.

The resolution of these issues turns on an undisputed fact and policy considerations. The undisputed fact is that Franco had planned to spend the night and not drive. The policy issues are whether tort duties and social host liability should apply when an underaged adult voluntarily drinks to excess and thereafter injures himself. We hold that certain defendants had no duty, while the duty of other defendants, and a related causation issue, present questions of fact for a jury to resolve. The three student guests had no duty to monitor the actions of Franco. Any duty of the Suitemates ended when Franco fell asleep with the previously-arranged plan to spend the night in the suite.

FDU and its student RAs are protected by the Charitable Immunity Act (CI Act), N.J.S.A. 2A:53A-7 to -11, which shields them from claims based on simple negligence. There are disputed issues of material fact concerning whether the RAs were grossly negligent or acted with willful or wanton indifference in failing to enforce FDU's policies prohibiting underage drinking.

There is also a related disputed issue of material fact concerning whether any breach by the RAs caused Franco's injuries.

Accordingly, we affirm the summary judgments in favor of the Suitemates and the social guests. We reverse the summary judgments in favor of the RAs. We also affirm in part and reverse in part the summary judgment in favor of FDU. The undisputed material facts established that FDU did not directly breach any duty to Franco. Nevertheless, FDU can be vicariously liable in its capacity as the employer of the RAs.

I.

We take the facts from the summary judgment record and view them in the light most favorable to Franco. See Bauer v. Nesbitt, 198 N.J. 601, 604 n.1 (2009) (first citing R. 4:46-2(c); and then citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); see also Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016).

In September 2014, Franco lived with his parents and commuted to FDU, where he was a college student in his junior year. He was a member of the Phi Sigma Kappa fraternity and periodically spent nights at FDU sleeping in friends' rooms or suites.

On September 18, 2014, while at FDU, Franco heard Frank Dades, one of

his fraternity brothers, discussing plans to host a Thursday night football-watching party in his suite (S207) in the Park Avenue residential hall. At Franco's request, Dades invited Franco to attend.

Before going to the party, Franco and his mother agreed he would spend the night at FDU and would travel from there to his part-time banking job the next morning. Accordingly, when Franco left his parents' home at around 8:30 p.m. that evening, he took his work clothes and toiletries with him.

Approximately twenty to thirty people attended the party, with students coming and leaving at different times. The party lasted several hours and broke up around 2 a.m. on September 19, 2014. The suite's residents – Dominick Stellaccio, Dades, Matthew Pieroni, and Matthew Smigelski (collectively, the Suitemates) – were present. Other students attending included Stellaccio's girlfriend Rachel Listman, and Spencer Goldin and Jason Misener, both of whom were Franco's fraternity brothers.

Franco arrived at the suite at approximately 10 p.m., bringing bottles of alcohol with him in a backpack. Several students attending the gathering saw Franco drinking from a bottle of clear liquid, which they assumed was alcohol. Franco was also seen drinking a beer he apparently had obtained while in S207. Students attending the party testified that beer and other alcohol was available

7

in S207 that evening. In addition, some guests brought beer to S207.

Franco's expert opined that Franco was visibly intoxicated while in S207 and had a rising blood alcohol content (BAC) of .15% around 12:30 a.m. and that his BAC peaked at .23% at 2:15 a.m. on September 19, 2014. A blood sample taken at the hospital following the car accident showed that Franco's BAC was .164% at 6:52 a.m. A driver is presumed to be under the influence of alcohol if his or her BAC is .08% or greater. N.J.S.A. 39:4-50(a).

Stellaccio, one of the Suitemates, saw Franco drinking and asked Franco if he was spending the night at the suite. When Franco confirmed he was staying, Stellaccio told Franco he would be sleeping on S207's common-room couch. S207 had two bedrooms with attached bathrooms, a common room, and a kitchenette.

Michael Brown, one of Franco's closest friends, also attended the gathering. Brown confirmed with Franco that he was not planning on driving that night. Brown offered to have Franco stay overnight in his dorm room. In response, Franco told Brown that he would be sleeping in S207. Later, after noticing that Franco was visibly intoxicated, Brown verified with Stellaccio that Franco was staying on the couch in S207 that night.

Sometime late in the evening or after midnight, Franco fell asleep on the

common-room couch. Thereafter, several people drew on Franco's face and body. Students also placed chairs on Franco. Franco did not react to either the drawing or the chairs being placed on him. Instead, he remained asleep.

Listman testified that she spent most of the evening in Stellaccio's bedroom and did not recall seeing Franco asleep before she went to bed in Stellaccio's room. Goldin slept in one of the bedrooms in S207, woke up sometime between 2 a.m. and 4 a.m., and saw Franco sleeping on the couch. Goldin reportedly maneuvered Franco onto his side and left a cup of water near him. Misener testified that he arrived at the suite around 8 p.m. Misener believed that Franco was visibly intoxicated when he left S207 around 10:30 p.m., soon after Franco had arrived.

Four RAs also attended the party: Michael DaCosta, Joseph Piserchio, James Frisby, and Alena Ramos. DaCosta and Frisby were off duty as RAs that night and attended the gathering as guests. Piserchio was on duty in another residential hall but also attended the gathering as a guest. Ramos was the RA on duty for the Park Avenue hall.

DaCosta saw Franco at the party but testified he did not have any contact with Franco and did not know anyone in S207 was drinking alcohol. When DaCosta left the gathering between 11:30 p.m. and 1:00 a.m., Franco was asleep

9

on the S207 common-room couch.

Frisby visited S207 around 10:30 p.m. after having multiple alcoholic beverages. Frisby saw Franco holding a clear bottle but denied seeing anyone in the suite drinking alcohol. When he left the suite around midnight, Franco was still in S207.

When Piserchio arrived, Franco was already in S207. Piserchio testified that he observed beer and alcohol in the suite and saw Franco holding a beer. Piserchio could not say when Franco fell asleep, but he admitted he was one of the people who had drawn on Franco as he slept around 1:30 a.m. He recalled only Franco, the Suitemates, Listman, and one other guest remaining in the suite when he departed.

Ramos walked into S207 around midnight. She testified that she did not observe anyone drinking or bringing alcohol into S207, nor did she recall observing anything that would trigger her to take action in her capacity as an RA. She purposefully stayed in the suite's kitchen to avoid seeing anything she would have to report. Ramos witnessed guests drawing on Franco as he slept but testified she did not know he was intoxicated. She left S207 around 1:30 a.m.

FDU had a written alcohol policy that prohibited underage drinking on

campus. The policy was published in FDU's student handbook and was distributed by email to every student each year. New students were required to take an online alcohol-education course. The University also regularly provided seminars on alcohol awareness, including programs for freshmen and an annual Alcohol Awareness Week.

FDU allowed students who were twenty-one years of age or older to possess and consume alcohol in certain residential halls, known as "wet" dorms, under certain conditions. Those conditions required that the students possess alcohol solely for their personal use, not become intoxicated, and not serve alcohol to underaged persons. The Park Avenue hall, which was on FDU's Florham Park campus, was a "wet" dorm. In the year before Franco's accident, FDU reported 528 alcohol violations. FDU's Public Safety Assistant Director acknowledged that there were more alcohol-related incidents at the Park Avenue hall than any other dorm.

The RAs were required to investigate and report to University senior staff conduct that violated FDU's alcohol policy. Accordingly, the RAs were required to perform nightly rounds in the residence halls. If an RA saw underage drinking, he or she was to identify all persons present, ask each person if they were drinking and, if they answered yes, note whether they consumed alcohol

11

or may be intoxicated. If there was a violation, the RAs were required to supervise the disposal of alcohol and document the situation. RAs were also required to call University public safety officers if they encountered a non-FDU student drinking, faced resistance, or believed someone needed medical attention.

None of the RAs who attended the party in S207 took any steps to determine if any underaged guest was drinking alcohol. They did not report Franco or anyone else for violation of the alcohol policy. Moreover, they did not notify senior staff or the Public Safety Office.

The last person to see Franco on September 19, 2014, was Goldin, who, when he woke up some time between 2 a.m. and 4 a.m., saw Franco sleeping on the couch with no chairs on him. After Goldin went back to sleep, Franco apparently woke up around 5 a.m., left the suite, got into his car, and drove off campus. At approximately 5:47 a.m., while traveling northbound on Route 287, Franco's car went off the road, drove up an embankment, struck an unoccupied, parked construction vehicle, slid back down the embankment, and flipped over. Franco suffered a traumatic brain injury, lost his eyesight and ability to speak, and his critical motor functions were impaired. Those permanent injuries have left him disabled. Franco was the only person injured in the accident.

12

In July 2016, Franco and his parents sued numerous defendants seeking to hold them liable for Franco's injuries. Franco settled with several defendants. The remaining defendants included FDU and eleven students: the four Suitemates, the four RAs, and three guests. In his fourth amended complaint, Franco alleged that the University and the students were negligent and grossly negligent for allowing him to drink to the point of intoxication and leave S207 while intoxicated. Franco sought to hold defendants liable for his personal injuries. His parents asserted claims of loss of consortium.

Following almost two years of extensive discovery, FDU and several of the students moved for summary judgment. The initial motion was filed by Listman and the trial court granted summary judgment in her favor in an order entered on October 12, 2018.

Thereafter, the University and all but two of the remaining student defendants filed for summary judgment. Franco cross-moved for partial summary judgment against FDU and the RAs. The trial court heard oral argument on those motions in January 2019. On February 8, 2019, the court entered orders granting summary judgment to all the remaining defendants except for Ramos and Smigelski, who had previously defaulted. The court also denied Franco's cross-motion. The court explained the reasons for its rulings in

13

a written opinion.

On March 3, 2019, counsel for plaintiffs sent the trial court a letter requesting it to enter summary judgment in favor of Smigelski and Ramos, the remaining defendants. Accordingly, on March 11, 2019, the court entered an order dismissing the claims against those two defendants and stated that it was doing so for the same reasons it had granted summary judgment to the other student defendants.[2]

## II.

Franco now appeals from the orders that granted summary judgment and dismissed his claims against FDU and the eleven students. He makes four main arguments, each of which has various sub-arguments. He contends that the trial court erred in (1) holding that none of defendants owed him a legal duty of care; (2) holding that Franco's injuries were not proximately caused by any of defendants' failures to exercise reasonable care; (3) dismissing his claims

---

[2] In the letter sent by plaintiffs' counsel, they pointed out that the trial court's reasoning in its prior decisions would likely apply to Smigelski and Ramos. Plaintiffs did not agree with the court's reasoning or sign a consent order dismissing their complaint. Accordingly, we reject defendants' argument that plaintiffs cannot appeal this order because they consented to the order. See Jacobs v. Mark Lindsay & Son Plumbing & Heating, Inc., 458 N.J. Super. 194, 205 (App. Div. 2019) (citing Winberry v. Salisbury, 5 N.J. 240, 255 (1950)) ("[A]n order consented to by the attorneys for each party is ordinarily not appealable.").

against the four Suitemates and three guest defendants; and (4) holding that FDU and the RAs were entitled to immunity under the Charitable Immunity Act.

A. Our Standard of Review

We conduct a de novo review of summary judgment orders and apply the same standard employed by the trial court. Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014). Accordingly, we determine whether the moving parties have demonstrated there were no genuine disputes as to any material facts and, if so, whether the moving parties are entitled to judgment as a matter of law. Id. at 405-06 (quoting Brill, 142 N.J. at 540). Our function, like the trial court's, is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)); R. 4:46-2(c). A dispute of a material fact is genuine if the "competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540.

B. Negligence

Franco asserts that FDU and the students were negligent and grossly negligent. To establish a claim of negligence, a plaintiff must show that there

was a legal duty, the duty was breached, the breach proximately caused a foreseeable injury, and plaintiff suffered damages. Townsend v. Pierre, 221 N.J. 36, 51 (2015) (citing Polzo v. Cnty. of Essex, 196 N.J. 569, 584 (2008)); Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013). Negligence is "conduct which falls below a standard recognized by the law as essential to the protection of others from unreasonable risks of harm." Marshall v. Klebanov, 378 N.J. Super. 371, 378 (App. Div. 2005) (quoting Sanzari v. Rosenfeld, 34 N.J. 128, 134 (1961)). The question is "'whether [a] reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others' by his [or her] conduct." Est. of Narleski v. Gomes, 244 N.J. 199, 226 (2020) (quoting Kelly v. Gwinnell, 96 N.J. 538, 543 (1984)); Rappaport v. Nichols, 31 N.J. 188, 201 (1959)).

Franco must establish the existence of negligence "by some competent proof," Townsend, 221 N.J. at 51 (quoting Davis, 219 N.J. at 406), because "[n]egligence is a fact which must be shown and which will not be presumed." Long v. Landy, 35 N.J. 44, 54 (1961). "The mere showing of an incident . . . is not alone sufficient to authorize the finding of an incident of negligence." Ibid.

16

The key questions on this appeal concern whether any defendants owed Franco a duty and, if so, how far that duty extended. Franco contends that FDU, the RAs, the Suitemates, and the three guests had the opportunity and ability to exercise reasonable care to prevent him from driving while drunk. Franco also argues that duties of care should be imposed because the foreseeable risks are substantial when excessive alcohol is consumed by an underaged person.

The question of whether a duty exists is a question of law. Robinson v. Vivirito, 217 N.J. 199, 208 (2014) (first citing Carvalho v. Toll Brothers & Devs., 143 N.J. 565, 572 (1996); and then citing Kelly, 96 N.J. at 552). Plaintiff must prove the existence of that duty. Mergel v. Colgate-Palmolive-Peet Co., 41 N.J. Super. 372, 379 (App. Div. 1956). "Any common law duty imposed by [a c]ourt must 'satisf[y] an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy.'" Narleski, 244 N.J. at 213 (second alteration in original) (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)).

Moreover, a court should consider whether the injury was foreseeable when determining if a duty exists. Est. of Desir ex rel. Estiverne v. Vertus, 214 N.J. 303, 317 (2013). In other words, if a duty is to be imposed, there must be a foreseeable risk of harm. J.S. v. R.T.H., 155 N.J. 330, 337 (1998) (citing

17

Williamson v. Waldman, 150 N.J. 232, 239 (1997)). A "duty of reasonable care and prudence is founded on the probabilities of a given situation, not on [the] mere possibility." Griesenbeck ex rel. Kuttner v. Walker, 199 N.J. Super. 132, 139 (App. Div. 1985) (citing McKinley v. Slenderella Sys., 63 N.J. Super. 571, 582 (App. Div. 1960)).

Accordingly, a court must consider whether it is practical for a defendant to try to prevent the injury to another. Podias v. Mairs, 394 N.J. Super. 338, 350 (App. Div. 2007) (citing J.S., 155 N.J. at 339-40). In determining whether to recognize a duty, courts consider four factors: "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Hopkins, 132 N.J. at 439 (citing Goldberg v. Hous. Auth., 38 N.J. 578, 583 (1962)); see also Narleski, 244 N.J. at 223; Kelly, 96 N.J. at 544.

Our Supreme Court has explained that there is a distinction between foreseeability as it relates to a determination of duty and foreseeability as it relates to proximate cause. Hill v. Yaskin, 75 N.J. 139, 143 (1977) ("Simply put, the distinction is between foreseeability as it impacts on duty determination and foreseeability as it is sometimes applied to proximate cause [-] a critical distinction too often (because too easily) overlooked."); see also Clohesy v.

18

Food Circus Supermarkets, 149 N.J. 496, 502-03 (1997) (recognizing that "[f]oreseeability as a determinant of a business owner's duty of care to its customers is to be distinguished from foreseeability as a determinant of whether a breach of duty is a proximate cause of an ultimate injury").

"The broad test of negligence is what a reasonably prudent person would foresee and would do in the light of this foresight under the circumstances." Hill, 75 N.J. at 144. Foreseeability as it relates to proximate cause, "on the other hand, relates to 'the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff' reasonably flowed from defendant's breach of duty." Clohesy, 149 N.J. at 503 (quoting Hill, 75 N.J. at 143). In other words, "[f]oreseeability in the proximate cause context relates to remoteness rather than the existence of a duty." Ibid.; see also S.H. v. K & H Transp., 465 N.J. Super. 201, 213-15 (App. Div. 2020) (discussing and analyzing the two different types of foreseeability).

Franco has asserted negligence claims against twelve defendants who can be analyzed in four groupings: (1) the four Suitemates; (2) the three guests; (3) FDU; and (4) the four RAs. The duty and scope of the duty of each group of defendants differ. Moreover, the potential liability of the student defendants within the groupings depends on the specific facts established by discovery.

Accordingly, we separately analyze whether there was a duty and the scope of that duty for each group of defendants.

In undertaking that evaluation, we are guided by the State's strong public policy of discouraging drunk driving. Our Supreme Court has recently emphasized that "[i]ntoxicated driving remains one of the preeminent public safety threats in New Jersey[.]" Narleski, 244 N.J. at 213. The Court has explained: "This State's public policy of imposing severe sanctions on drunk drivers and of prohibiting the service of alcohol to minors and visibly intoxicated adults has deep roots in our law. The common law has been in the vanguard in addressing the acute problem of underage drinking and drunk driving." Ibid.

1.    The Suitemates

The question of whether the four Suitemates owed Franco a duty is not directly answered by statutes or existing case law. Instead, imposing a duty would involve an extension of the common law.

The SH Act does not apply because that Act addresses the liability of a social host "who legally provides alcoholic beverages to another person who has attained the legal age to purchase and consume alcoholic beverages." N.J.S.A. 2A:15-5.5. Franco was not of legal age to purchase and consume alcohol.

A-3055-18

New Jersey criminal law prohibits supplying alcohol to minors and making property available to facilitate underaged consumption of alcohol. N.J.S.A. 2C:33-17(a) and (b). Our Supreme Court has clarified, however, that those criminal statutes "create penal sanctions, not tort liability standards." Narleski, 244 N.J. at 218; see also Thomas v. Romeis, 234 N.J. Super. 364, 374 (App. Div. 1989) (discerning no legislative intent that N.J.S.A. 2C:33-17 be used to establish a tort standard). Accordingly, in considering whether to impose a duty, we look to existing case law addressing common law social host duty.

Initially, we clarify that the Suitemates' potential duty is governed by social host liability and not some general negligence theory. Franco's injuries arose out of his drunk driving and for the past four decades, when the SH Act does not apply New Jersey has addressed such claims under the common law of social host liability. See Narleski, 244 N.J. at 213-17; see also Linn v. Rand, 140 N.J. Super. 212, 219 (App. Div. 1976) (establishing liability of social host who served alcohol to a visibly intoxicated minor, causing injury to another); Romeis, 234 N.J. Super. at 371.

In determining whether to impose a duty on the Suitemates and determining the extent of that duty, we are guided by the most recent case

21

addressing and analyzing social host liability: <u>Narleski</u>. There, the Court held that an adult, underaged social host who allowed other underaged adult guests to drink alcohol in his parents' home could be liable to a third party injured by an intoxicated underaged social guest if certain facts were established. 244 N.J. at 228. To establish liability, a plaintiff must be able to present evidence of five facts:

> 1. The social host knowingly permitted and facilitated the consumption of alcoholic beverages to underage guests in a residence under his control . . . ;
>
> 2. The social host knowingly provided alcohol to a visibly intoxicated underage guest or knowingly permitted the visibly intoxicated underage guest to serve himself or be served by others . . . ;
>
> 3. The social host knew or reasonably should have known that the visibly intoxicated social guest would leave the premises and operate a motor vehicle and therefore would foreseeably endanger the lives and property of others;
>
> 4. The social host did not take any reasonable steps to prevent the intoxicated guest from getting behind the wheel of the vehicle; and
>
> 5. The social guest, as a result of intoxication facilitated by the social host, negligently operated a vehicle and proximately caused injury to a third party.
>
> [<u>Ibid.</u>]

Two of those facts are not present in this case. First, Franco is a first-party plaintiff; there was no injury to a third party. Second, the evidence established that the Suitemates believed that Franco was spending the night in S207 and would not be driving. Consequently, to impose a duty on the Suitemates we would extend social host liability into new territory. Indeed, in Narleski, the Court recognized that its holding was a new rule announced in 2020. Ibid. While the Court applied that "new social host liability rule to the parties in [that] case," ibid., it is not clear the rule would apply to the Suitemates in this case because the gathering took place in 2014, approximately six years before Narleski extended social host liability.

But even if the new Narleski rule was applied to this case, as already noted, there are material factual distinctions between this case and Narleski. Most of the existing case law concerning social host liability addresses claims by third parties. In other words, the duty the social host owes is to a third party who is injured when the intoxicated guest drives a car and causes an accident. Case law imposing first-party liability is limited and distinguishable.

Our Supreme Court has not yet addressed first-party social host liability. We have addressed first-party liability in two published cases: Finer v. Talbot, 230 N.J. Super. 19, 21 (App. Div. 1988), and Camp v. Lummino, 352 N.J. Super.

23

414, 415-16 (App. Div. 2002). There are also two published cases issued by the Law Division: Wagner v. Schlue, 255 N.J. Super. 391, 397 n.2 (Law Div. 1992), and Batten by Batten v. Bobo, 218 N.J. Super. 589, 590-91 (Law Div. 1986).

In Finer, an of-age motorist was killed when he drove his vehicle into a tree. 230 N.J. Super. at 20. His next of kin alleged defendant, a social host, negligently served decedent alcohol when he was visibly intoxicated. Id. at 20-21. The SH Act had not been enacted at the time of the accident but had been passed by the time we considered the issues on appeal. Id. at 21. We reversed the denial of the social host's motion for summary judgment because the first-party liability plaintiffs sought to impose had not been judicially recognized and would have been "an extension of principles rejected by the [SH Act.]" Ibid.

In Camp, a twenty-year-old plaintiff attended a party, consumed alcohol to excess, and was injured in a single-vehicle accident after leaving. 352 N.J. Super. at 416. Plaintiff sued the social host, who moved for summary judgment. The trial court denied defendant's motion for summary judgment, and we affirmed. Id. at 420.

The focus of our decision in Camp was on defendant's contention that plaintiff was precluded from bringing a suit under N.J.S.A. 39:6A-4.5(b) because plaintiff had pled guilty to driving while intoxicated. Id. at 416-17.

N.J.S.A. 39:6A-4.5(b) bars a person who is convicted of or pleads guilty to driving while intoxicated from recovering economic and non-economic damages sustained in the accident. We determined that statute did not immunize a social host who contributed to causing an accident by serving an underaged drinker. Camp, 352 N.J. Super. at 419. Additionally, we rejected the argument that the SH Act precluded Camp's lawsuit because he was under the age of twenty-one, making the SH Act inapplicable. Id. at 417; see also N.J.S.A. 2A:15-5.6(a) (outlining liability for negligent provision of alcohol to an of-age drinker). Given the arguments presented in Camp, we did not address whether social hosts generally would be subject to tort liability and would owe a duty to a first-party plaintiff.

In Bobo, the Law Division determined an "intoxicated minor guest c[ould] maintain a cause of action against [a] social host," but that matter involved a fifteen-year-old child, not a legal adult. 218 N.J. Super. at 591. The other case, Wagner, did not involve statutory or common law social host liability. 255 N.J. Super. at 397 n.2. The Law Division considered the duty of a defendant who entrusted a vehicle to his intoxicated wife, who then sued him after she drove and was injured in an automobile accident. Id. at 392-93.

None of those cases answers the duty issues posed in this matter. Accordingly, our analysis turns to whether we should extend social host liability for a first-party claim under the material facts of this case. We decline to make such an extension because the four factors for recognizing a tort duty do not support imposing liability on the Suitemates.

The relationship among the Suitemates and Franco were friendships developed at college. The party did not take place in a private home; rather, it took place in a college dormitory. Nonetheless, the Suitemates controlled access to the suite and permitted Franco to bring alcohol and to drink to the point where he was visibly intoxicated.

The nature of the attendant risks was well known. Those risks included that Franco could drive and cause injury to others or himself. As the Court has recently noted, "the scope of the public-health threat presented by drunk drivers in general and underage drunk drivers in particular" is well known and well documented. Narleski, 244 N.J. at 224-25.

The key consideration is whether the Suitemates had the opportunity and ability to exercise care to prevent Franco from driving. The record establishes that at least one of the Suitemates confirmed with Franco that he planned to spend the night in S207. Making inferences in plaintiffs' favor we accept on this

26

record that the Suitemates saw Franco visibly intoxicated. The record also established, however, that all the Suitemates saw Franco fall asleep and, therefore, reasonably expected that he would sleep off his intoxication.

Franco argues that the Suitemates should have done something more, such as take his car keys or call for medical assistance. There is no evidence that any of the Suitemates saw Franco attempt to leave the suite to drive. Moreover, Franco has no expert to testify that he was in medical distress or required medical assistance while in S207.

We are mindful of the disturbing fact that at least two of the Suitemates and other guests drew markings on Franco and placed chairs on him while he was asleep. Although such immature behavior should not be encouraged or condoned, there is no evidence it created any greater risk that Franco would drive while intoxicated. Furthermore, Goldin, the last person to see Franco before the accident, testified that he saw Franco asleep on the couch with no chairs on him. More critically, when the gathering broke up and the Suitemates all went to sleep, Franco was asleep. Consequently, no Suitemate saw Franco wake up later and leave the suite.

Underaged adults have "all the civil rights and obligations of any other adult – other than the privilege to consume alcohol." Id. at 225. The public

policy question posed in this case is whether imposing a duty on an underaged adult not to provide alcohol to a visibly intoxicated underaged guest will deter drunk driving. "The public clearly has an interest in deterring the unnecessary destruction and maiming of lives on our roadways and highways." Id. at 226. Nevertheless, while the SH Act is inapplicable to this matter, its legislative history reflects a policy of holding social hosts responsible only "in extreme circumstances where their behavior is egregious and their culpability is manifest" because "a social host is not the party at fault for the accident[.]" Sponsor's Statement to S. 545 3 (L. 1987, c. 404). Accordingly, the SH Act does not allow first-party claims.

Imposing a duty of care on a social host to an underaged adult social guest would be inconsistent with the policies embodied in the SH Act. Franco voluntarily chose to drink. He did it in a context where the expectation was that he would stay in the suite and not drive. At some point, when no one else was awake, Franco awoke and made the decision to drive while he was still intoxicated. Given those undisputed material facts, we do not think that it would advance the goal of deterring drunk driving by imposing a duty and making the Suitemates liable for Franco's injuries.

2.    The Social Guest

28

Next, we analyze a clearer issue: was Franco owed a duty by other social guests who never saw him attempt to leave the gathering to drive a car? We hold no; those social guests did not owe a duty to Franco.

Franco asserted claims of negligence and gross negligence against Misener, Listman, and Goldin, who were also guests attending the gathering in S207. Franco alleges that Listman and Misener brought containers of beer to S207, and Franco may have consumed some of those beers. Franco claims that Goldin, while not a Suitemate, often slept over at S207 and did so on the night of the gathering.

No case or statute in New Jersey imposes a civil tort duty of care on social guests to monitor and control the alcoholic drinking of another guest absent a special relationship or circumstance. Champion ex rel. Ezzo v. Dunfee, 398 N.J. Super. 112, 121 (App. Div. 2008) (citations omitted). We decline to impose a new duty on the three social guests in this case.

There is no evidence that Listman, Misener, or Goldin invited Franco to S207 or controlled access to that suite. Accordingly, their relationship with Franco was as co-guests. More importantly, there is no evidence that Misener, Listman, or Goldin saw Franco leaving the suite in an intoxicated condition. Misener left the suite by 10:30 p.m., when Franco was still in the suite. Listman

testified that she fell asleep in one of the bedrooms, did not see Franco fall asleep in the common room, and did not see him thereafter. Goldin was the last person to see Franco, but he saw Franco sleeping. Goldin then went back to bed. Accordingly, none of the guests had reason to believe that Franco would be operating a motor vehicle while he was intoxicated. Generally, "mere presence at the commission of the [alleged] wrong, or failure to object to it, is not enough to charge one with responsibility inasmuch as there is no duty to take affirmative steps to interfere." Id. at 118 (quoting Podias, 394 N.J. Super. at 346).

3.    FDU

Franco argues that FDU was negligent and grossly negligent in failing to enforce its alcohol policies and allowing a "wet" dorm. Franco also argues that FDU and its RAs are not protected by the CI Act because when he was injured, the University was not promoting an educational purpose and he was not a beneficiary of FDU's educational works. We disagree.

FDU is a nonprofit entity organized to promote higher education. "[A]n entity qualifies for charitable immunity when it '(1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works.'"

30                                                                                  A-3055-18

O'Connell v. State, 171 N.J. 484, 489 (2002) (quoting Hamel v. State, 321 N.J. Super. 67, 72 (App. Div. 1999)). Accordingly, when FDU is promoting education, a beneficiary of that education cannot sue FDU or its employees for negligence. N.J.S.A. 2A:53A-7(a); Green v. Monmouth Univ., 237 N.J. 516, 530-31 (2019); Hardwicke v. Am. Boychoir Sch., 188 N.J. 69, 95 (2006).

There is no dispute that FDU satisfies the first two prongs of the test for charitable immunity. Franco, however, disputes the third prong. The third prong of the charitable immunity test involves two inquiries: (1) whether the organization "was engaged in the performance of the . . . objectives it was organized to advance[;]" and (2) "whether 'the injured party [was] a direct recipient of those [charitable] works.'" Green, 237 N.J. at 531 (second alteration in original) (quoting Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 350 (2003)).

The CI Act "is to be liberally construed," and "the phrase 'educational purpose' has been interpreted broadly." Id. at 538. Accordingly, nonprofit entities have "substantial latitude in determining the appropriate avenues for achieving their objectives." Orzech v. Fairleigh Dickinson Univ., 411 N.J. Super. 198, 206 (App. Div. 2009) (quoting Bloom v. Seton Hall Univ., 307 N.J. Super. 487, 491 (App. Div. 1998)). In Green, for example, the Court held that

a non-student injured at a concert in a university building could not sue the university for negligence because the concert was "a cultural and educational experience" the attendee received. 237 N.J. at 538. We have also recognized that a university is engaged in educational works where it provides dormitory residences to its students because a campus experience that allows the opportunity for diverse forms of social interchange is consistent with reasonable educational goals. Orzech, 411 N.J. Super. at 209. Critically, a student's violation of a university's alcohol policy in a dorm does not extinguish his beneficiary status. Id. at 210-11 (barring negligence action by student who, after drinking to excess, fell out a dormitory window); see also Bloom, 307 N.J. Super. at 492 (holding student injured in a campus pub was a beneficiary of college's works).

In all those cases, the Supreme Court and this court reasoned that educational purposes were to be construed broadly and persons receiving those educational purposes were also to be construed broadly. Applying the holdings and rationale of these cases, we hold that when Franco was at the gathering at an FDU dormitory, the University was promoting an educational purpose and Franco was a beneficiary of that purpose. We have already recognized that residential halls promote a university's educational goals by allowing social

32

interaction. While Franco did not live on campus, he nonetheless was a beneficiary of FDU's educational purposes when he socially interacted with other students in a residential hall. Consequently, we affirm the dismissal of plaintiffs' direct negligence claims against FDU.

We also affirm the dismissal of Franco's claims of gross negligence because there are no facts establishing that FDU engaged in gross negligence. Initially, we clarify the scope of the immunity provided by the CI Act.

When Franco was injured in 2014, the CI Act did not exempt employees of the charitable entity from claims for damages caused by gross negligence or willful or wanton conduct. L. 1995, c. 183, § 1 ("Nothing in this section shall be deemed to grant immunity to . . . [an] employee . . . causing damage by a willful, wanton or grossly negligent act[.]"). Our Supreme Court clarified that exclusion also applied to the charitable organization itself and, thus, the CI Act barred simple negligence actions only. Hardwicke, 188 N.J. at 98. The CI Act did not preclude claims based on "other forms of aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior." Ibid. (quoting Schultz v. Roman Cath. Archdiocese, 95 N.J. 530, 542 (1984) (Handler, J., dissenting)).

33

More recently, the Legislature amended the CI Act to expressly vitiate the immunity of a nonprofit charitable entity in addition to its employees for damages caused by "a willful, wanton or grossly negligent act[.]" L. 2019, c. 120, § 5. That amendment was effective December 1, 2019. Therefore, the holding in Hardwicke governs here and makes FDU open to a claim for damages arising out of gross negligence, recklessness, intentional and willful or wanton conduct. 188 N.J. at 97, 99.

FDU argues that the language in Hardwicke was dicta and the holding in Hardwicke is limited to intentional acts such as sexual assault. We reject that argument. The Court in Hardwicke was clear and expressly held "that the [CI Act] immunizes simple negligence only, and not 'other forms of aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior.'" Id. at 97 (citation omitted). Consequently, to the extent that the trial court held that FDU could not be liable for gross negligence, we reject that holding.[3]

---

[3] In 2011, we held that the CI Act's exemption for claims arising from the negligent operation of a motor vehicle did not apply to the charitable entity and only applied to individual trustees, directors, officers, employees, agents, servants, or volunteers of the charitable entity. Hehre v. DeMarco, 421 N.J. Super. 501, 505 (App. Div. 2011). The exemption for negligent operation of an automobile is in a separate section from the exemption that governs here.

Although FDU could be subject to a claim based on gross negligence, the undisputed material facts here establish that FDU was not grossly negligent. Moreover, those facts also establish that FDU did not engage in willful or wanton conduct.

Gross negligence "is commonly associated with egregious conduct and is used to describe 'the upper reaches of negligent conduct.'" Kain v. Gloucester City, 436 N.J. Super. 466, 482 (App. Div. 2014) (citations omitted). Accordingly, gross negligence exists on a scale above ordinary negligence and recklessness and is part of a continuum of conduct that extends to intentional acts. Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 363 (2016). Gross negligence is more than inattention or mistaken judgment. Id. at 364.

Willful or wanton conduct is an even higher standard than gross negligence. Id. at 365-66. "Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 178 (1999) (citing McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)). This "implies an intentional deviation from a clear duty[.]" Steinberg, 226 N.J. at 366 (citation omitted). To establish

---

Compare N.J.S.A. 2A:53-7(c)(2) with N.J.S.A. 2A:53-7(c)(1). Moreover, logically a charitable entity cannot drive a car.

a claim of willful or wanton conduct, a plaintiff must demonstrate that defendant acted or failed to act with knowledge that injury would likely or probably result and with reckless indifference to that consequence. Foldi v. Jeffries, 93 N.J. 533, 549 (1983).

FDU did not host the gathering where Franco became intoxicated or invite Franco to that gathering. The involvement of the University itself was limited to providing a dormitory. More importantly, FDU had policies prohibiting excessive drinking and underage drinking. FDU also had administrators, security personnel, and RAs who monitored for violations of its alcohol policies and enforced those policies. There is no evidence in the record that FDU was grossly negligent in enforcing its policies on September 18 and 19, 2014. Similarly, there is no evidence in the record that FDU's actions or omissions rose to the level of willful or wanton conduct concerning the gathering in S207.

4. The RAs

Like FDU, the RAs are immunized from claims of simple negligence under the CI Act. Abdallah v. Occupational Ctr. of Hudson Cnty, 351 N.J. Super. 280, 282 n.1 (App. Div. 2002) (citing N.J.S.A. 2A:53A-7). Thus, the RAs can be held liable only if Franco has evidence showing that the RAs engaged in gross negligence or willful or wanton conduct. Following the close

36

of discovery, Franco presented some evidence that the RAs may have engaged in gross negligence or willful or wanton conduct. There is also a related factual question of whether any breaches by the RAs caused Franco's injuries.

The responsibilities of FDU's RAs were set forth in the University's 2014-2015 Resident Assistant Manual and Resident Assistant Agreement. RAs were "expected to abide by, and enforce, all FDU Community Standards, Campus Life policies, State and/or Federal Laws anywhere on campus or in FDU owned or leased property." The Resident Assistant Manual contained an alcohol protocol. Under that protocol, if RAs suspected that there was underage drinking going on in a dormitory, they were to (1) knock and announce themselves; (2) ask to speak to the residents; (3) ask each person found in the room or suite for his or her name and identification; (4) "[a]sk each person '[h]ave you been drinking?' and note each person's response"; (5) if there was alcohol, supervise disposal of the alcohol; and (6) "[i]nform the people that [they] will be documenting the situation." RAs were required to call FDU public safety officials if they felt intimidated, if "[s]omeone may need medical attention," or if residents were uncooperative. In addition, RAs were expected to comply with the reporting requirements and the alcohol protocol even when off duty.

Viewing the facts in the light most favorable to Franco, there is evidence from which a jury could find that all the RAs were aware that underage drinking was occurring in S207. Some of the student defendants, as well as other guests who were at the gathering, testified at their depositions that people at the party, including Franco, were openly drinking alcohol.

RA Ramos came to the party at S207 around midnight when she was the on-duty RA for that dormitory. She did not abide by the University's alcohol policies or protocol. She did not ask for everyone's identification nor did she report the underaged drinking. Instead, she stood in the kitchen and did nothing.

RA Piserchio was on duty at another residential hall when he came to the party at S207. He observed beer and alcohol in the suite and saw Franco holding a beer. When Franco fell asleep, Piserchio participated in drawing on Franco. He did not abide by the University's alcohol policies or protocol. He did not take the beer from Franco and report Franco. Nor did he supervise the disposal of all the alcohol in the suite.

RAs DaCosta and Frisby were off duty as RAs on the night of the party. Nevertheless, under the University's Resident Assistant Manual, they were still expected to comply with the protocol even when off duty. Both DaCosta and Frisby saw Franco at the party. While they both denied seeing anyone drinking,

on this summary judgment record that contention presents a credibility question for a jury because other guests testified that people at the party, including Franco, were openly drinking alcohol.

Based on that evidence, a reasonable jury could determine that one or more of the RAs were grossly negligent or were willfully or wantonly indifferent when they failed to enforce the University's policies prohibiting underaged and excessive drinking. Nevertheless, if the jury determines that one or more of the RAs was grossly negligent, that will not end the inquiry. The issue will then become whether any RA's gross negligence had a causal connection to the injuries suffered by Franco.

Franco is not claiming that he was injured simply by drinking to a point of intoxication. There is no evidence in the record that anyone believed Franco needed medical attention. The evidence establishes that he fell asleep while intoxicated and was sleeping for several hours. All the RAs testified without rebuttal that when they left S207 Franco was either still in the suite or asleep in the suite.

More critically, Franco's injuries resulted from an automobile accident. None of the RAs saw Franco attempt to leave S207 in an intoxicated condition with the intent to drive. Accordingly, the jury will need to be instructed that if

A-3055-18

they find gross negligence by any of the RAs they must also find that Franco's injuries from the car accident reasonably flow from the RAs' gross negligence. See Hill, 75 N.J. at 143. In other words, the jury must find that the inactions or omissions by the RAs had a foreseeable causal connection to Franco's driving while intoxicated. If, on the other hand, the jury finds that the RAs reasonably believed that Franco would not leave S207 in an intoxicated condition and operate a motor vehicle, then that finding would break the chain in any causation argument.

## III.

In summary, we hold that the Suitemates and three student guests owed no duty to Franco in this first-party common law negligence action. Whether the four student RAs, and through them FDU vicariously, engaged in any gross negligence or willful or wanton conduct presents a jury question. In resolving that question, the jury will also have to determine if the injuries suffered by Franco flowed from any act or omission of the RAs. Accordingly, on remand it will be plaintiffs' obligation to establish the scope of the RAs' duty, as well as to prove any breach proximately caused Franco's injuries. The jury will also have to consider any comparative negligence of Franco. N.J.S.A. 2A:15-5.1; New Gold Equities Corp. v. Jaffe Spindler Co., 453 N.J. Super. 358, 380 (App.

Div. 2018) (quoting <u>LaBracio Fam. P'ship v. 1239 Roosevelt Ave., Inc.</u>, 340 N.J. Super. 155, 164 (App. Div. 2001) ("When apportioning liability . . . 'the fact-finder should compare the fault of all parties whose negligence was a proximate cause of the plaintiff's injuries.'"); <u>see also</u> N.J.S.A. 2A:15-5.2.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3055-18